**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| KOPP DEVELOPMENT INC., | ) | |
| | ) | Civil Action No. 1:21-cv-01216-PAB |
| Plaintiff, | ) | |
| | ) | Judge Pamela A. Barker |
| v. | ) | Magistrate Judge David A. Ruiz |
| | ) | |
| METRASENS, INC. | ) | |
| | ) | |
| Defendant. | ) | |

**MOTION OF DEFENDANT METRASENS, INC.
TO EXCLUDE TESTIMONY OF PLANTIFF'S DAMAGES EXPERT
AND FOR SUMMARY JUDGMENT AS TO ALL CLAIMS**

Defendant Metrasens, Inc (Metrasens"), by its undersigned counsel, respectfully moves the Court *in limine* to exclude the testimony of the damages expert of Plaintiff Kopp Development, Inc. ("KDI").  As is shown in the accompanying memorandum of law, the expert's proposed damages testimony relies entirely on revenue projections created by KDI for review by potential buyers of the company, and neither the expert nor KDI provided any basis for the projections.

Metrasens further moves the Court, pursuant to Rule 56 of the Federal Rules of Civil Procedure, to grant summary judgment in its favor as to all claims of KDI.  The patent claims of KDI are foreclosed by the decision of the Patent Trial and Appeal Board invalidating the asserted patent.  KDI's request for injunctive relief is foreclosed because Metrasens has removed the allegedly inaccurate report from its website and will not be disclosing it in the future.  Finally, the damage claims of KDI are foreclosed (1) because KDI has no competent evidence of a damages amount (2) and also because there is no genuine issue of fact as to the existence of damages at all, regardless of difficulties in computation.

For these reasons, and those set forth in the accompanying memorandum of law, Metrasens Inc. respectfully requests that the Court order the exclusion of the testimony of KDI's damages expert, and that the Court grant Metrasens summary judgment as to all claims of KDI.

Respectfully submitted,

 /s/ *Michael T. Smith*
Michael T. Smith  (Admitted Pro Hac 8/17/2021)
BIRCH, STEWART, KOLASCH & BIRCH, LLP
8110 Gatehouse Road, Suite 100
Falls Church, VA 22042
Telephone: (703) 205-8048
Facsimile: (703) 205-8050
msmight@bskb.com
mailroom@bskb.com

James C. Carpenter (0012228)
Vincent I. Holzhall (0074901)
STEPTOE & JOHNSON PLLC
41 S. High Street, Suite 2200
Columbus, OH 43216-5028
Telephone: 614-221-5100
Fax: 614-221-0952
jim.carpenter@steptoe-johnson.com
vince.holzhall@steptoe-johnson.com

*Counsel for Defendant Metrasens, Inc.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| KOPP DEVELOPMENT INC., | ) | |
| | ) | Civil Action No. 1:21-cv-01216-PAB |
| Plaintiff, | ) | |
| | ) | Judge Pamela A. Barker |
| v. | ) | Magistrate Judge David A. Ruiz |
| | ) | |
| METRASENS, INC. | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF EXCLUSION OF PLANTIFF'S EXPERT TESTIMONY, AND FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

I.   INTRODUCTION AND SUMMARY ............................................................... 1

II.  FACTS .................................................................................................... 3

III. STANDARD OF LAW ............................................................................... 8

   A. Summary Judgement ........................................................................ 8

   B. Exclusion of Expert Testimony ........................................................ 9

IV.  ARGUMENT ......................................................................................... 10

   A. KDI's Patent Claims are Invalid .................................................... 10

   B. KDI's Claim for Injunctive Relief is Moot, Because Metrasens Has Halted Use of the Report at Issue ....................................................................................... 10

   C. KDI Cannot Show the Existence of a Genuine Issue as to the Fact of Damages ...... 12

   D. The Proposed Testimony of KDI's Damages Expert Should be Excluded as Unreliable under Fed. R. Evid. 702, Because of his Reliance on Unvalidated KDI Projections ........................................................................................ 15

   E. In the Alternative, the Court Should Exclude Testimony on Dr. Burke Because Both of his Reports Calculates "Damages" for Products Not Mentioned in the Intertek Report ............................................................................................. 20

V. CONCLUSION ........................................................................................ 24

# TABLE OF AUTHORITIES

<u>Cases</u>

*Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) ........................................................ 9

*Am. Council of Certified Physicians & Surgeons v. Am. Bd. Of Podiatric Surgery, Inc.*, 185 F.3d
606, 613, (6th Cir. 1999) ................................................................................................... 13

*Anderson v. WBNS-TV, Inc*., 158 Ohio St. 3d 307, 309, 141 N.E.3d 192, 196 (2019)................. 12

*Apple Inc. v. Samsung Elecs. Co*., 735 F.3d 1352, 1375 (Fed. Cir. 2013)................................... 11

*Ask Chems., LP v. Computer Packages, Inc*., 593 Fed. App'x. 506 (6th Cir. 2014)................... 18

*Balance Dynamics Corp. v. Schmitt Indus*., 204 F.3d 683, 693 (6th Cir. 2000) ......................... 13

*Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009).......................................... 9

*Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384 (D.N.J. 2009) ........... 11

*Broan Mfg. Co. v. Associated Distribs*., 923 F.2d 1232, 1235 (6th Cir. 1991) ........................... 13

*CIT Grp./Bus. Credit, Inc. v. Graco Fishing & Rental Tools, Inc*., 815 F. Supp. 2d 673, 677
(S.D.N.Y. 2011). .............................................................................................................. 19

*Delman v. City of Cleveland Heights*, 41 Ohio St. 3d 1, 4, 534 N.E.2d 835, 838 (1989) ........... 12

*Kavalec v. Ohio Express, Inc*., 71 N.E.3d 660, 669 (Ohio Ct. App. 2016) ................................... 13

*Kenty v. Transamerica Premium Ins. Co*., 72 Ohio St. 3d 415, 418-19, 650 N.E.2d. 863, 866
(1995).................................................................................................................................. 12

*King-Indiana Forge, Inc. v. Millennium  Forge, Inc*., No. 1:07-cv-00341-SEB-SML, 2009 U.S.
Dist. LEXIS 96131, 2009 WL 3187685, at *2 (S.D. Ind. Sept. 29, 2009) ............................... 19

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) ............................................................ 9

*Navarro v. Procter & Gamble Co*., 501 F. Supp. 3d 482, 494 (S.D. Ohio 2020) ....................... 24

*Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 252 (6th Cir. 2001) .................................. 10, 24

*Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 254 (6th Cir. 2001) (quoting *GE v. Joiner*, 522
U.S. 136, 146 (1977)............................................................................................................. 18

*Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000) ............................................................... 9

*Seven-Up Co. v. Coca-Cola Co.,* 86 F.3d 1379, 1390 (5th Cir. 1996) ........................................ 12

*Shreve v. Franklin Cnty*, 743 F.3d 126, 131 (6th Cir. 2014) ........................................................ 8

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1480 (6th Cir. 1989) ............................................ 9

*Supply & Bldg. Co. v. Estee Lauder Int'l, Inc., 2001 U.S. Dist. LEXIS 20737, *12* (S.D.N.Y Dec. 13, 2001) ................................................................................................................... 19

*Taubman Co. v. Webfeats*, 319 F.3d 770, 775 (6th Cir. 2003) ...................................................... 11

*United States v. Sammons*, 55 F.4th 1062, 1072 (6th Cir. 2022) ............................................. 9, 24

*Universal Coin & Bullion, Ltd. v. Fed. Express Corp*., No. 2:12-cv-2778-SHM-dkv, 2015 U.S. Dist. LEXIS 201767, *34 ................................................................................................... 19

*Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ........................................................ 11

<u>Rules</u>

Fed. R. Civ. P. 56(a) ...................................................................................................................... 8

# I.     INTRODUCTION AND SUMMARY

Plaintiff Kopp Development, Inc. ("KDI") brought this litigation against its competitor, Metrasens, Inc. ("Metrasens"), alleging two different types of claims: patent-related and tort.  Both companies make devices designed to detect iron or other ferromagnetic items on persons who work around, or are to be tested in, magnetic resonance imaging ("MRI") devices.  KDI has stipulated to dismissal of its patent claims in light of an order from the Patent Trial and Appeal Board invalidating the patent-in-suit.  ECF No. 41.

The remaining claims[1] of KDI assert common law claims of tortious interference, defamation and negligent misrepresentation (Counts 1, 2 and 3), and statutory false advertising claims (Count 4) under the Lanham Act.  All the remaining claims are premised on allegedly false statements in a report prepared by Intertek Testing and Certification, Ltd. at the request of Metrasens (the "Intertek Report"). The report compared the performance of a Metrasens product and a KDI product (the "Ferralert Solo") that, KDI alleges, was outdated at the time of testing, thereby rendering the comparison misleading. Metrasens previously had the report on its website but removed it some time ago, and Metrasens has certified to the Court (ECF No. 40) that it will not use the report, or the information in it, in the future.

Summary Judgement is proper as to all of the damage claims of KDI because there is no genuine issue of fact as to damages. The inadequacy of the damages claims is two-fold. First, KDI does not have evidence of the *fact* of any damages. KDI does not have any statements from customers that they were influenced by the allegedly false statements; KDI has identified no specific sales lost; and KDI identified only two potential customers that actually saw the allegedly

---

[1] The Court has already dismissed KDI's sixth claim for relief, which was for a declaratory judgment of non-infringement of Metrasens' patents, as not presenting a justiciable issue.  ECF No. 23.

false statements. One potential customer decided against changing to KDI from Metrasens based on price of the other. KDI's corporate representative (and owner) could offer nothing but the testimony that unknown persons said, at tradeshows or possibly elsewhere, that unnamed customers had said they were aware of a report that the Metrasens product was superior. No KDI salespeople or employees provided statements as to customers reviewing the Intertek Report or changing sales plans because of it. KDI also provided no assessment of the sales by Metrasens and no evidence that any part of those sales would have gone to KDI.

In addition, KDI's damages claims fail because the proposed testimony of its damages expert is not based on any trustworthy or accepted methodology and must be excluded under *Daubert* and its progeny. The KDI expert, Dr. Burke, does not purport to opine on causation. Dr. Burke's reports (there were two plus a rebuttal report) assume that there were false statements by Metrasens and that the statements caused KDI not to meet certain sales projections. Dr. Burke, however, does not rely on historical trends or his own expertise in making projections as to the KDI sales or revenue.  Instead, Dr. Burke based his calculations on counsel-supplied revenue projections created by KDI.  The two projections were not created by KDI in the ordinary course of business, but in connection with a potential sale of the company and the second projection was only a draft, and never finalized. Dr. Burke did not evaluate the projections or inquire into the methodology or bases for the projections. KDI's corporate representative could say little more about the bases and methodology for the reports than that he and others in the company worked on them.  The KDI expert did not have even that smattering of information at the time of submission of his reports.

The offering memoranda were, thus, facially without a reasonable basis for reliance.  In addition, the memoranda had specific indicators of unreliability. The memoranda noted that they

were unaudited and that anyone reviewing should undertake due diligence rather than relying on them.  The 2016 projections made before 2019 (the date of the Intertek Report) were not accurate as to the periods that had passed.  For example, the 2017 projection was for 4.2 million dollars in sales but actual sales were 3.1 million dollars.

The KDI expert compounded the reliability problems in his expert reports, by not basing them on the only product mentioned in the Intertek report. The initial report had been based on sales projections (and lost profits or margin) only as to a single product—the KDI "Halo"—a product that was not mentioned in the Intertek Report.  In the second report, which quadrupled the damages total, the expert included projected revenue from four products in KDI's line of ferromagnetic safety devices, only one of which was the "Solo" product mentioned in the Intertek Report. Dr. Burke disclaimed any expertise in marketing or the effects of false statements on MRI screening devices, but nonetheless asserted that the inclusion of other products was proper.  For that Dr. Burke said he relied on common sense, and (possibly) his youthful experience as an encyclopedia and Fuller Brush salesman. Because Dr. Burke applied no reliable methodology, the testimony is not admissible under Fed. R. Evid. 702.

## II.    FACTS

The claims remaining in this litigation arise from a comparative report, created at the request of Defendant Metrasens, comparing one of its products to the "Solo" product produced by Plaintiff KDI.  KDI and Metrasens are competitors in the ferromagnetic detector business. ECF No. 1, Compl. ¶¶ 8-9. The parties' ferromagnetic detectors are placed outside MRI scanning rooms to prevent potentially hazardous ferromagnetic items (on patients or workers) from inadvertently entering into the MRI scanning room. *Id*. at ¶ 10.

3

The comparative report, referred to as the "Intertek Report," because it was prepared by Intertek Testing & Certification, Ltd., was dated as of May 2019, and identified superior performance in the Metrasens product. *See*, Exh. 9, Intertek Report. KDI alleges that the report was misleading because Metrasens provided Intertek a detector that was an older, out-of-date, model of the KDI Ferralert "Solo" product *Id*. at ¶¶ 12-15. KDI alleges that Metrasens disclosed the report to customers and prospective customers, and placed the report on the Metrasens website (*Id*. at ¶¶ 27-29) and that KDI suffered substantial lost revenue because of that. *Id.* at ¶¶ 43, 48 and 54.

In the course of discovery, KDI has produced two damages reports by its expert, Dr. John Burke, an original report dated October 16, 2023 and a revised report dated February 12, 2024, attached as Exhibits 3 and 4 to this motion. The reports do not contain any discussion of causation and Dr. Burke confirmed at his deposition that he had no expert opinion on causation. Exh. 1, Burke Dep. at 48:21-25.

In discovery KDI produced no customer surveys as to attitudes toward KDI and its products. KDI also produced no emails or documents from customers or potential customers giving notice of cancellation of orders due to the Intertek report. KDI did not produce records showing existing customer relationships that were broken off after the release of the Intertek Report. KDI did not produce or identify any emails or documents even reflecting customer knowledge of the Intertek report, other than two instances discussed below. Other than those two instances, KDI did not identify any employees who had communications, or produce employee statements, regarding customer knowledge of the Intertek Report. KDI produced no declarations, statements or e-mails from third party distributors regarding the Intertek Report.

The first instance of the two instances of potential customers having knowledge of the Intertek report involved Phillps Healthcare. KDI produced a lengthy email string (attached as Exhibit 5) largely between John Vassallo of Phillips and Anna Srb of KDI. Mr. Vasallo's initial email says he is interested in "an introduction to Kopp Development and your solutions related to ferromagnetic detection in MRI installations."  Exh, 5, Email of John Vasallo dated 5/5/2020.  In the initial emails, Ms. Srb provide information on KDI and its products, but on May 24, 2020, Mr. Vasallo states that a Metrasens on its website "claims . . . far better than [the] competition when it comes to Detection comparison of smaller risk items" and he asks he would "[l]ike to better understand Kopp capability on this criteria." Id., Email of John Vasallo dated 5/24/2020. Ms. Srb responded. stating that the Metrasens claims are false, that Metrasens is "notorious for making false claims." *Id*., Srb Email of May 30, 2020. After some other exchanges as to possible joint testing, and the provision by Ms. Srb of proposal, Mr. Vassallo said: "if we assume for a moment that Kopp's performance is proven to be at least at a par with the Metrasens equivalent, then I am afraid that the Kopp proposal would unfortunately not compete on price" and that KDI's "all in price" would have to be reduced at least $1000."  *Id*., Email of John Vassallo, 09/25/2020.  Ms. Srb responded with some proposals as to installation and other matters, and Mr. Vasallo thanked her, but said on October 4, 2020 that "unless we can find a way on [the] pricing issue, I do not see a way how we go any further at this stage." *Id*., Email of John Vassallo, 10/04/2020.  After some questions on volume, Ms. Srb responded with a revised price list, to which Mr. Vassallo, in the last email of the chain, responded that the offer had "been shared with Business and I will come back to you should there be an interest to explore further."  Id., Email of John Vassallo, 10/28/20.

The second instance KDI identified in which a customer or potential customer showed knowledge of the Intertek report, occurred in an inquiry to KDI from a distributor, ETS Lindgren,

giving notice of a customer inquiry about the report. Exh. 11, Kopp Dep. Ex. 5, Email from Anna Srb, 4/25/2021.  The email says the customer is considering a purchase but inquired about a portion of the Intertek report.  *Id*. KDI provided no further documents on the event, and no statements form its distributor, ETS Lindgren.  However, the corporate representative of KDI, Mr. Keith Kopp, testified that the customer was MD Anderson and that it was his understanding that MD Anderson ended up buying from Metrasens, although he had no direct knowledge. Exh. 10, Kopp Dep. of 05/24/2024, at 87:12-89:16. Mr. Kopp said he thought one of the KDI employees went to MD Anderson and saw Metrasens equipment, but he did not know who.  *Id*.

During his depositions as a corporate representative for KDI, Mr. Kopp was asked about whether there were any customers who cancelled orders due to the Intertek Report, and he responded:  "I don't know any."  Id. at 86:8-12.  Mr. Kopp did say that "potential customers" were lost but identified only the MD Anderson event. Id. at 87:1-11.  When asked whether there were any other potential customers, Mr. Kopp said:  "Several of our other distributors indicated there was a problem.  I can't get down to specific customers, but there was a problem that we're losing business because of this Intertek report, but specific customers, I can't recall offhand." Id. at 91:6-10. Asked whether there were communications showing a customer chose not to buy from KDI because of the Intertek report, Mr. Kopp identified no instances but instead said "That almost never happens in any kind of business." Id. at 91:11-15.

The damages evidence of KDI consisted of the two expert reports of Dr. Burke dated October 16, 2023 and February 12, 2024, attached as Exhibits 2 and 3, and their supporting documents. The first report projected damages if $1,610,195. Exh. 2, Burke Report of 10/16/2023, at 3.  The second projected damages more than four times higher: $8,584,332. Exh. 3, Revised Burke report of 02/12/2024, at 3.  Despite that differential, the methodologies were nearly

identical.   In the revised, second report, Dr. Burke identified only three changes other than grammatical changes: "updating" the discount rate, using present value or capitalization on the figures for 2024 and 2025, and correcting "the gross sales to include the total revenue from all products rather than only the Halo product." Exh. 3, Revised Burke Report of 02/12/2024, at 1. The last change was the major one. The Halo product was not mentioned in the Intertek report, which discussed only the Solo product.  *See* Exh. 9, Intertek Report. Neither the first nor the second report explained why that product, rather than the Solo product was the product used. The reports also do not explain why the revenue from the full screener product line, rather than just the Solo product is used.

By including the full product line, the projected sales increase greatly.  For example, the variance between the first and second reports, for 2023, for the actual sales, projected gross sales and projected lost sales are set forth below:

|  | First Report | Second Report |
|---|---|---|
| 2023 Actual Gross Sales | $4,825,950 | $4,825,950 |
| 2023 Projected Gross Sales | $5,269,819 | $7,513,993 |
| Projected Lost Sales | $443,386 | $2,688,043 |

*Compare* Exh. 2, Burke Report of 10/16/2023, at 3 *with* Exh. 3, Revised Burke report of 02/12/2024, at 3.

The source of the projected gross sales for both reports was not Dr. Burke, but projections created by KDI in connection with potential sale of the company. Both reports identify  "projected growth as coming from "Financial Highlights" in a note on page 10 of the report.  That was a document prepared by KDI, as Dr. Burke confirmed in his deposition. Exh. 1, Burke Dep. at 82:3-83:15; 29:22-30:7; 82:13-21.  The "financial highlights" document is taken directly from page 6

of the "Confidential Information Memorandum" prepared by KDI.  *Compare* Exh. 6, Financial Highlights, Burke Dep. Ex. 3, *with* Exh. 8, Confidential Information Memorandum, Burke Dep. Exh. 6 at 6[2]. That document was prepared by KDI in connection with a potential sale and, thus, Dr. Burke agreed, was a document intended to make the company "look good." Exh. 1, Burke Dep. at 62:24-63:8. Dr. Burke did not testify to knowledge of how the projections were made, and did not cite to any economic or other principle or treatise on which to rely on the projections.  Dr. Burke stated that he did not validate the projections but accepted them because he trusts attorneys. *Id*. at 92:25-93:13

KDI's sales have been rising since 2019; Dr. Burke's report shows actual sales of $3,242,622 in 2019 and sales of $4,825,950 in 2023.  Exh. 3, Revised Burke report of 02/12/2024, at 10.  The projected revenue is critical because the damage projections of Dr. Burke arise from a comparison of the actual revenues of KDI compared to the projections –comparing one revenue stream to another. *Id*. at 18:8-10.

### III.    STANDARD OF LAW

#### A.  Summary Judgement

Rule 56 of the Federal Rules of Civil Procedure provides that, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "No genuine dispute of material fact exists where the record 'taken as a whole could not lead a rational trier of fact to find for the non-moving party.'"  *Shreve v. Franklin Cnty*, 743 F.3d 126, 131 (6th Cir. 2014) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

---

[2] The documents were marked confidential and attorney eyes only by KDI, but counsel for the parties have agreed to de-designate all documents submitted to the Court as evidence, and the documents, therefore, are not filed under seal.

The moving party may show an absence of a genuine dispute of material fact by demonstrating "that there is an absence of evidence to support the nonmoving party's case." *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  Once the moving party has satisfied its burden, the responding party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1480 (6th Cir. 1989) (quoting *Matsushita,* 475 U.S. at 586).  The party opposing the motion may not "'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (quoting *Street*, 886 F.2d at 1479).

## B.  Exclusion of Expert Testimony

Under Rule 702 of the Federal Rules of Evidence, "[d]istrict courts serve a 'gatekeeping role' in screening expert testimony to ensure that only reliable evidence goes to the jury." *United States v. Sammons*, 55 F.4th 1062, 1072 (6th Cir. 2022) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)).  "[U]nder *Daubert* and its progeny, a party proffering expert testimony must show by a 'preponderance of proof' that the expert whose testimony is being offered is qualified and will testify to scientific knowledge that will assist the trier of fact in understanding and disposing of issues relevant to the case." *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000).  The trial court's gatekeeping role, however, "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).  An expert who presents testimony must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id*. at 152.  "[C]lose judicial analysis of expert

testimony is necessary 'because expert witnesses are not necessarily always unbiased scientists.'" *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 252 (6th Cir. 2001) (citation omitted).  Thus, "[a] district court is not required to admit expert testimony 'that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.'" *Id*. at 254 (6th Cir. 2001) (quoting *GE v. Joiner*, 522 U.S. 136, 146 (1977)).

## IV.  ARGUMENT

### A.  KDI's Patent Claims are Invalid

This Court has already dismissed the KDI claim for a declaratory judgment of non-infringement as to patents of Metrasens (sixth count), on the grounds that there was no justiciable case or controversy.  ECF No. 23. KDI has consented to dismissal of its patent infringement claims against Metrasens. ECF No. 41.

### B.  KDI's Claim for Injunctive Relief is Moot, Because Metrasens Has Halted Use of the Report at Issue

KDI's complaint seeks a permanent injunction to preclude publication by Metrasens of "false or misleading information regarding Kopp Development Products". ECF No. 1, Complaint at 11, ¶ A.   As discussed in the statement of facts, the only alleged false statements by Metrasens related to the Intertek Report, comparing the performance of the KDI "Solo" product to that a Metrasens product.   Metrasens, however, has previously removed the Intertek Report and all references to the report from its website; in a filing with the Court, Metrasens has agreed not to make use of the report or its information in the future. ECF No. 40.  Therefore, there is now no longer a basis on which to grant injunctive relief.

Injunctions should only issue where "essential in order effectually to protect property rights against injuries otherwise irremediable."  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312

(1982) (quoting *Cavanaugh v. Looney*, 248 U.S. 453, 456 (1919) Thus, the Supreme Court held in *Weinberger* that proof of a violation of the Federal Water Pollution Control Act did not automatically entitle the applicant to issuance of a permanent injunction.  Because an injunction is proper only where there is a threat of irremediable harm, injunctive relief is not proper when a party has ceased the challenged conduct and stated its intent not to resume.  T*aubman Co. v. Webfeats*, 319 F.3d 770, 775 (6th Cir. 2003) (reversing grant of preliminary injunction because the challenged action was no longer threatened). In *Taubman,* the defendant's website had included links to sites allegedly violating the Lanham Act rights of the plaintiff, but the defendant had removed the allegedly improper advertising links prior to the injunction and had stated (in a letter to the plaintiff's counsel) that he would not place advertising of any kind on his website in the future). *Id*. at 776, n.2. The Sixth Circuit reversed the grant of the preliminary injunction holding that injunctive relief was "proper only to prevent an on-going violation."  *Id*. at 775.

Courts have repeatedly denied permanent injunctions where the challenged conduct has halted and there is no basis on which to expect repetition.  For example, the Court of Appeals for the Federal Circuit upheld the denial of a permanent injunction in a case involving (among other claims) trade dress infringement, where "undisputed evidence shows that [defendant] has stopped selling the products found to dilute [plaintiff's] trade dress, and there is no evidence suggesting that [defendant] will resume selling them." *Apple Inc. v. Samsung Elecs. Co*., 735 F.3d 1352, 1375 (Fed. Cir. 2013).  Another court denied permanent injunctive relief in a case involving alleged false advertising because "injunctive relief is not appropriate since [the plaintiff] cannot show it will suffer irreparable harm absent the injunction since the challenged activity has ceased." *Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384 (D.N.J. 2009) (citing *Robert Stigwood Group, Ltd. v. Hurtwiz*, 462 F.2d 910, 913 (2d Cir. 1972) (denying injunctive relief

11

where there is no "cognizable danger of recurrent violation, something more than the mere possibility"). *See also Seven-Up Co. v. Coca-Cola Co.,* 86 F.3d 1379, 1390 (5th Cir. 1996) (upholding denial or permanent injunction where the defendant had not used the allegedly false and misleading material in some time).

### C. KDI Cannot Show the Existence of a Genuine Issue as to the Fact of Damages

KDI did not provide any expert report on causation or on the effect of the Intertek Report on actual or potential customers. As discussed further below, KDI's sole expert, Dr. Burke, provided no opinion as to causation. Exh. 1, Burke Dep. at 48:21-25. Dr. Burke instead provided a damages calculation based on the failure of KDI to achieve certain sales projections that KDI made in connection with potential sale of the company. Without regard to the problems in KDI's effort to calculate the *amount* of damages (addressed below), the Court should grant summary judgment because there is no genuine issue of fact as to the *existence* of any damages.

KDI seeks a damages award under all of its theories of recovery ECF No. 1, Complaint, at 11, ¶ A, B. The complaint contains three common law claims (tortious interference, negligent misrepresentation, and defamation) and one statutory claim of false advertising under the Lanham Act. *Id.* at 7, 8, and (Second, Third, Fourth and Fifth claims for relief). Proof of harm is a required element for all of the claims. *See Kenty v. Transamerica Premium Ins. Co*., 72 Ohio St. 3d 415, 418-19, 650 N.E.2d. 863, 866 (1995) (adopting Restatement and setting forth elements of tortious interference, including the requirement for pecuniary loss); *Delman v. City of Cleveland Heights*, 41 Ohio St. 3d 1, 4, 534 N.E.2d 835, 838 (1989) (adopting Restatement and setting forth elements of negligent misrepresentation, including pecuniary loss); *Anderson v. WBNS-TV, Inc*., 158 Ohio St. 3d 307, 309, 141 N.E.3d 192, 196 (2019) (setting out elements of defamation, including proof of harm proximately caused by the defamation); *Am. Council of Certified Physicians & Surgeons*

*v. Am. Bd. Of Podiatric Surgery, Inc.*, 185 F.3d 606, 613, (6th Cir. 1999) (setting out elements of defamation, including proof of harm);  *Balance Dynamics Corp. v. Schmitt Indus*., 204 F.3d 683, 693 (6th Cir. 2000) (setting out elements of recovery for false advertising under the Lanham Act and holding that, even in cases of literal falsity, a plaintiff cannot recover marketplace damages without proof that such damages occurred).

Under both its common law and its Lanham Act claims, KDI has the duty to show the existence damages.  As to the common law claims under Ohio law, "a plaintiff must show its entitlement to damages in an amount ascertainable with reasonable certainty."  *Kavalec v. Ohio Express, Inc*., 71 N.E.3d 660, 669 (Ohio Ct. App. 2016).  Under the Lanham Act, a plaintiff must show "that some damages were the certain result of the wrong" and must demonstrate to "a reasonable certainty" that any claimed future lost profits would actually arise.  *Broan Mfg. Co. v. Associated Distribs*., 923 F.2d 1232, 1235 (6th Cir. 1991) (citation omitted). KDI's expert was not tasked with opining on causation ( Exh. 1, Burke Dep. at 48:21-25) and so KDI must look elsewhere for evidence.  KDI has not produced any surveys or other evidence of harm to its goodwill.  KDI has not, in the course of discovery, identified any evidence that it lost a single customer or sale.  In fact, KDI identifies only two actual or potential customers that were aware of the Intertek Report, and it identified no customer or potential customer who made a decision based on the report.

The first potential customer was Phillips Healthcare. The email string produced by KDI shows that Phillips contacted KDI to ask for an "introduction to Kopp" products. Exh. 5, Email of John Vassallo, 5/20/2020.  In the course of the emails back-and-forth, the Phillips representative inquired about the Intertek Report, which was on the Metrasens website, and asked KDI if it had comparative data. *Id*., Email from John Vassallo, 5/24/2020.  KDI responded that the Metrasens

13

report was false and, in two follow-ups, (1) stated that there were no comparative studies available, (2) offered to send a system for testing, and (3) provided Phillips a quote on KDI's products.  *Id*., Emails of Anna Srb of 5/30/2020 and 6/15/2020.  The Phillips representative eventually responded and advised that "if we assume for a moment that Kopp's performance is proven to be at least at a par with the Metrasens equivalent, then I am afraid that the Kopp proposal would unfortunately not compete on price."  *Id*., Email from John Vassallo, 9/25/20.  The same email advised that Kopp's "all in price" must be "reduced by at least $1000."  *Id.*  After KDI sent a revised proposal (not attached to the document produced by KDI), in the last email in the string the Phillips representative said that he would "come back to you should there be an interest to explore further." *Id*., Email from John Vassallo, 10/28/20.

The second potential customer was MD Anderson.  KDI received notice from a distributor, ETS Lingren, that a customer had seen the Intertek report. Exh. 11, Kopp Dep. Ex. 5, Email from Anna Srb, 4/25/2021.  The KDI corporate representative, Keith Kopp, testified that he "believes" that a KDI employee, whom he could not name, saw Metrasens equipment at MD Anderson after the communication.  Exh. 11, Kopp Dep. 5/24/24, at 88:25-90:16. Mr. Kopp confirmed that he had no knowledge of anyone at MD Anderson notifying KDI that false advertising was the deciding factor in the sale.  Id. at 94:4-18.  Mr. Kopp provided no other information on the potential MD Anderson sale.

The only other evidence Mr. Kopp disclosed was that "several distributors indicated there was a problem [but] I can't get down to specific customers."  *Id*. at 91:3-10.  When asked whether he was aware of any specific customer or potential customer communication showing the customer would not buy because of the Intertek Report, Mr. Kopp said: "That almost never happens. People

do not tell you they are not going to buy from you. I would be surprised if such a document existed." *Id.* at 91:11-19.

KDI, of course, had the right to seek out emails, other documents, and oral testimony from the supposed distributors who had the supposed communications. If KDI exercised that right, it has not provided the information in discovery and its corporate representative did not disclose the information. Of course, KDI may have failed to seek out the information needed to support its claims, or found that the information does not exist. Regardless of the reason KDI has failed to identify evidence that customers actually turned away from KDI, the present state of the record entitles Metrasens to summary judgment. KDI has not shown the fact of damages with reasonable certainty.

**D. The Proposed Testimony of KDI's Damages Expert Should be Excluded as Unreliable under Fed. R. Evid. 702, Because of his Reliance on Unvalidated KDI Projections**

Dr. Burke provided two expert reports on his opinions, both of which are deeply flawed. Dr. Burke's second expert report quadrupled the damages claim of KDI from a total of $1,610,195 to $8,584,332. *Compare* Exh. 2, Burke Report of 10/16/2023, at 3 *with* Exh. 3, Revised Burke report of 02/12/2024, at 3. Despite the vast difference in outcomes, both reports are deeply flawed. As discussed in the next section, neither report even attempts to project lost revenue as to the only product mentioned in the Intertek Report – the KDI Solo product. The Court need not reach that issue however, because both reports are defective in relying on assumptions—revenue forecasts— provided by KDI. Dr. Burke simply accepted the assumptions of the forecasts, which he did not explain and which he did not validate, rendering his testimony unreliable.

Dr. Burke's damages methodology begins with projected or "forecasted" revenue figures for KDI for each year from 2019 (when the Intertek Report was published) though the present, and

then deducts the actual sales revenues of KDI from the projected numbers. That difference is treated as "lost gross sales" caused by the Intertek Report. Dr. Burke then applies a "projected EBITDA" percentage –based on a contribution or profit margin he separately calculated—to derive the asserted damages for each year. The process is apparent in the following schedule, found on the last page of Dr. Burke's second report:

| | (a) | (b) Forecasted Gross | (c) Actual Gross | | (d) Projected | | (e) Present Value |
|---|---|---|---|---|---|---|---|
| Year | Growth Rate | Sales | Sales | Lost Gross Sales | EBITDA | Lost EBITDA | Lost EBITDA |
| 2019 | | $5,229,048 | $3,242,622 | $1,986,427 | 28.10% | $558,186 | $558,186 |
| 2020 | | $5,759,277 | $3,876,482 | $1,882,794 | 21.50% | $404,801 | $404,801 |
| 2021 | | $6,367,815 | $4,332,056 | $2,035,760 | 21.90% | $445,831 | $445,831 |
| 2022 | | $7,022,423 | $4,510,234 | $2,512,189 | 22.20% | $557,706 | $557,706 |
| 2023 | 7.00% | $7,513,993 | $4,825,950 | $2,688,043 | 22.50% | $604,810 | $604,810 |
| 2024 | 8.70% | $8,167,710 | $5,245,808 | $2,921,902 | 22.90% | $669,116 | $669,116 |
| 2025 | 8.00% | $8,821,127 | $5,665,473 | $3,155,655 | 23.20% | $732,112 | $643,898 |
| Total | | | | $17,182,770 | | $3,972,561 | $3,884,347 |

Schedule Showing the Lost EBITDA from 2019-2025 Projected lost Revenues

Exh. 3, Revised Burke Report of 2/12/24, at 10. Dr. Burke confirmed the approach in his deposition. Exh. 1, Burke Dep. at 30:10-17. Dr. Burke testified that his task was "to calculate the difference between two revenue streams" (*id*. at 18:8-10) which, he clarified, was "the decline in revenue compared to projected revenue . . . the difference between these two revenue streams." *Id*. at 19:23-25. Although Metrasens and its expert disagree with many steps in the comparison process, for purposes of this motion Metrasens is challenging the reliance of Dr. Burke on the projected or forecast gross sales provided by KDI. There was no basis for that reliance.

Dr. Burke's second report notes that the projected revenues for 2019 -2022 were "KDI forecasted . . . sales" and that "KDI expected sales to grow" by the 7.00%, 8.70% and 8.00% rates. Exh. 3 Revised Burke Report of 2/12/2023, at 1. Footnotes (a) and (b) on page 10 of the second report note that the source of the projections is the "financial highlights" document prepared by KDI. *Id*. at 10. Dr. Burke confirmed the point in his deposition. Exh. 1, Burke Dep. at 82:3-83:15; 29:22-30:7; 82:13-21. The "financial highlights" document is taken directly from page 6 of the

16

"Confidential Information Memorandum" prepared by KDI. *Compare* Exh. 6, Financial Highlights, Burke Dep. Ex. 3, *with* Exh. 8, Confidential Information Memorandum, Burke Dep. Exh. 6 at 6.

The fundamental problem with use of the KDI projections is that Dr. Burke did not prepare the projections and did nothing to validate them. Exh. 1, Burke Dep. at 63:1-8. Dr. Burke was aware that the projections were not prepared in the ordinary course of business but as part of an effort to sell KDI. *Id.* at 60:20-62:23. Dr. Burke also knew that businesses prepare such sales or offering documents with the intention of making themselves look good. *Id*. at 62:24-63:8. Dr. Burke nevertheless accepted the numbers without any effort at validation because he trusts attorneys, as this colloquy at his deposition shows:

> Q  Well, I'm not asking for them to be audited. I'm asking whether you undertook any efforts to validate or confirm the reliability of these numbers?
>
> A  Oh, I accepted them. I said that several times. I accepted these numbers as a given.
>
> Q  So the answer would be, no, you didn't do anything to validate --
>
> A  Correct. I did not do anything. As I said, maybe I'm naive, but I'm one of those guys who trust attorneys. They give me the numbers, I believe them. I'm married to an attorney. I have to believe them.

*Id*. at 92:25-93:13

There is, therefore, nothing more than the assertion of Dr. Burke that the projections are a proper starting point from which to assess damages. That is an inadequate basis. "A district court is not required to admit expert testimony 'that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the

data and the opinion proffered.'" *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 254 (6th Cir. 2001) (quoting *GE v. Joiner*, 522 U.S. 136, 146 (1977)).

In reliance on the rules recognized in *Nelson*, the Sixth Circuit upheld exclusion of expert testimony in a case with very strong parallels to this one: *Ask Chems., LP v. Computer Packages, Inc.*, 593 Fed. App'x. 506 (6th Cir. 2014). In that case, the defendant had failed in its contractual duty to make a payment necessary to continue a Japanese patent in existence. Despite that undisputed fact, the district court excluded the testimony of the plaintiff's damages expert and, on that basis, granted summary judgment to the defendant. *Id.* at 507. Although the expert was qualified, the expert's damages methodology was excluded as unreliable. *Id.* The expert relied in part on a marketing plan of the plaintiff created long prior to the event at issue, and extrapolated from it to estimate lost profits for future years, "all without explaining his method[s] or assumptions." *Id.* at 510.

The expert's opinion was not saved by the provisions of Rule 703 of the Federal Rules of Evidence that allow reliance on "facts or data" that are hearsay, if other experts in the field "would reasonably rely" on the data. *Id.* The Sixth Circuit held that the expert's "wholesale adoption of Plaintiff's estimates, without revealing or apparently even evaluating the bases for those estimates, goes beyond relying on facts or data and instead cloaks unexamined assumptions in the authority of expert analysis." *Id.*

Dr. Burke's report and testimony constitute "wholesale acceptance" of the projections prepared in 2016 regarding potential sale of KDI, without any evaluation of the basis of the projections, thereby simply cloaking the projections in an unwarranted appearance of expertise. But, as the Sixth Circuit expressly held, "[w]here an expert merely offers his client's opinion as his own, that opinion may be excluded." *Id.* In the *Ask Chemicals* case, the court cited with

approval two decisions supporting that rule. The first was in the Southern District of New York in which that court excluded expert testimony because it was based on "the conclusory statements of [the party's management] and not on [the expert's] independent evaluation of the facts." *CIT Grp./Bus. Credit, Inc. v. Graco Fishing & Rental Tools, Inc*., 815 F. Supp. 2d 673, 677 (S.D.N.Y. 2011). The second was a decision of the Southern District of Indiana excluding testimony of a damages expert, finding that, "[w]hen an expert's proffered opinion merely parrots information provided to him by a party, that opinion is generally excluded." *King-Indiana Forge, Inc. v. Millennium Forge, Inc*., No. 1:07-cv-00341-SEB-SML, 2009 U.S. Dist. LEXIS 96131, 2009 WL 3187685, at *2 (S.D. Ind. Sept. 29, 2009).

The *King-Indiana* decision further held that "when an expert relies upon information given to him by a party or counsel, he must independently verify that information before utilizing it in his calculations." *Id*. at *4. That is not changed by Fed. R. Evid. 703, because that rule "does not 'allow a witness, under the guise of giving expert testimony, to in effect become the mouthpiece for the witnesses on whose statements or opinions the expert purports to base his opinion.'" *Id*. at *5-6. (quoting *Black & Decker v. Bosch Tools*, 2006 U.S. Dist. LEXIS 97173, 2006 WL 5156873, at *1 (N.D. Ill. 2006) (inner citation omitted). Other courts concur. *See, e.g., Supply & Bldg. Co. v. Estee Lauder Int'l, Inc., 2001 U.S. Dist. LEXIS 20737, *12* (S.D.N.Y Dec. 13, 2001) (excluding damages report because "[a]ssumptions based on conclusory statements of the expert's client, rather than on the expert's independent evaluation are not reasonable.") (citing *Argus, Inc. v. Eastman Kodak Co.,* 612 F. Supp. 904, 926 (S.D.N.Y. 1985)); *Universal Coin & Bullion, Ltd. v. Fed. Express Corp*., No. 2:12-cv-2778-SHM-dkv, 2015 U.S. Dist. LEXIS 201767, *34 (W.D. Tenn. June 30, 2015) (excluding plaintiff's damages expert testimony, in part, because the "gross profit margin [that] served as the basis for [the expert's] calculations" was supplied by the

plaintiff's counsel and the expert "did not perform any expert validation of the gross profit margin to ensure its reliability as required by Rule 703"). That is the situation in this case.

The lack of any validation or assessment of the KDI sales projections is made worse, in this case, because there were several warning signs indicating that the projections were not reliable.

- As noted above, Dr. Burke agreed that revenue projections made in anticipation of sale are intended to make a company "look good." Exh. 1, Burke Dep. at 62:11-63:8.

- The projections were prepared in 2016, prior to the COVID pandemic and, therefore, did not take into account the impact of COVID on the health care system or market.

- The projections were made before the invalidation of KDI's patent, which occurred in December of 2023.  ECF No. 41.  KDI's corporate representative acknowledged that the offering memorandum (from which the projections were taken) mentioned the patent, and that the patent was a "valuable asset" because it discourages potential competitors.  Exh. 10, Kopp Dep., 5/24/2024, at 40:1-16.

- The projection had been shown inaccurate by the time Dr. Kopp relied on them. For example, the projection (in 2016) for 2017 was for $4.2 million in revenue, but Dr. Burke acknowledged that the actual revenue, as of the time of his report, was $3.1 million. Exh. 1, Burke Dep. at 59:22-60:8.

An expert's reliance on the forecasts or projections of KDI, without validation or even investigation, would be inherently unreliable. Those problems are exacerbated by the other indicia that reliance on the 2016 projections in 2024 was unreasonable.  For all of these reasons, the Court should exclude the damages testimony of Dr. Burke.

### E. In the Alternative, the Court Should Exclude Testimony on Dr. Burke Because Both of his Reports Calculated "Damages" for Products Not Mentioned in the Intertek Report

An alternative basis to exclude any testimony of Dr. Burke is that neither of his reports calculated damages based on the only product that was the subject of comparison.  The first report projected damages as to sales of the KDI "Halo" product, but that product was not mentioned in the Intertek Report, which dealt only with the "Solo" product. The second report included the Halo, Solo and two other screening products, and more than  quadrupled the damages figure from a total of $1,610,195 to $8,584,332. Compare Exh. 2, Burke Report of October 16, 2023, at 3 with Exh. 3 Revised Burke report of 02/12/2024,  at 3.

Dr. Burke noted the difference in his second report, stating that he revised "gross sales to include the total revenue from all products rather than only the Halo product."  Exh. 3, Revised Burke report of 02/12/2024,  at 1.  But the Intertek Report at issue provided a comparison as to only one KDI product: the Solo product.  Exh. 9, Intertek Report.  Neither damages calculation was limited to that product.

Dr. Burke gave two reasons for expanding the damages calculations beyond the one product mentioned in the Intertek Report, but neither provides reasonable support for the expansion.

The first basis appears (anticipatorily) in the rebuttal report of Dr. Burke. There, Dr. Burke states that that KDI's counsel had "provided me with information that shows sales of Solo products would also include/affect sales of the entry way and screener products." Exh. 4, Burke Rebuttal Report, at 4.  The rebuttal report has a footnote referring to an "Exhibit G: Correspondence with Phillips" (*id.*) which, during the deposition made clear is the email chain involving Phillips Healthcare/John Vassallo and Anna Srb, a salesperson for KDI.  Exh. 1, Burke Dep. at 49:13-52-7.  Dr. Burke confirmed that the email string was one he relied on "for the proposition that sales of the Solo product would also include/affect sales of both the entry way and screener products."

*Id*. at 52:3-7.  That email string was discussed extensively above and, as shown there, involved an inquiry from Phillips Healthcare about KDI products, followed by a decision of Phillips not to purchase, based on price.  *See, supra* at 15-16. When asked to explain how the email showed an effect on multiple product lines, Dr. Burke said that the email referred to "lines of products" to be introduced, and added: "Doesn't that say they all kind of go together?"  *Id*. at 52:3-25.  Upon a follow up question, however, Dr. Burke admitted that the email does not say that "if you buy one, you're going to buy the other," but rather that "if a salesman goes in, if he's got a line of products he's going to try to sell the whole line."  *Id.* at 53:1-11.  Dr. Burke then admitted, in response to the next question, that that his position was based on assumption;

> Q   But you say here, "Sales of the Solo product would also include/affect sales of both the entry way.
>
>  So you're just assuming that, correct?
>
> A   Yes.  So I've got to make another note to myself.

*Id.* at 53:12-17.

Dr. Burke had one other argument at his deposition in support of his revision of the report to include the screener product line of KDI, rather than the one product discussed in the Intertek Report. Dr. Burke said it was "simple logic . . . a rumor that McDonald's french fries cause impotency [means] they're not going to be selling many hamburgers either." *Id.* at 44:8-16.  Dr. Burke did not explain how the performance comparison regarding the KDI Solo product to the performance of the Metrasens product was equivalent to a food causing impotency.  As a matter of "simple logic," a car manufacturer may have one poorly performing model, without all models being of low quality.

In addition to leaving a logical gap, Dr. Burke's testimony showed he had little basis to draw any conclusion about cross over affects.  In fact, Dr. Burke said he didn't "have much

understanding" about the testing that was done but only "what the attorney told me." *Id*. at 42:23-25.  As he recalled, the attorney told him that Metrasens "compared a new piece of [Metrasens] machinery with a Kopp piece of machinery that was, maybe, 20 or 25 or 30 years old." Exh. 1 at 43:1-11.  Dr. Burke said he didn't "have much of an idea of what was tested" but thought it "was just kind of one product." *Id*. at 43:19-21. On follow-up about KDI's false advertising claim, Dr. Burke conceded that he "didn't pay any attention to that. That's not my field.  I'm not an expert on false advertising or on these machinery." *Id*. at 44:20-45:1. Despite conceding a lack of expertise, Dr. Burke testified that he did rely on his experience as a salesman: as a "young man [he] sold all kinds of things" including vacuums, encyclopedias and the Fuller-brush products. *Id*. at 45:22-46:15. Dr. Burke did not explain how this experience translated to expertise in the market for MRI screener products or justified calculating damages on products not discussed in the "defamatory" publication.

Dr. Burke cited no other basis for his dramatic expansion of the scope of claimed damages, and he provided no basis for his failure to take obvious steps to validate his position. For example, he did not claim that he had interviewed people in the field, and did not identify any literature about the market or claimed to have done research on it.  Dr. Burke conceded that was aware of no studies supporting his theory that the Intertek Report affected products other than the Solo product. *Id.* at 46:6-8.  Dr. Burke also admitted that did not conduct any surveys as to the effect of the alleged false advertising. *Id*. at 39:23-25. Furthermore, Dr. Buke did not explain how or why a company whose reputation and goodwill allegedly were tarnished by false advertising, has continued to see the growing sales and revenues disclosed in the damages report itself.  The "Actual Gross Sales" to which Dr. Burke compares the inflated "Forecast Gross Sales" grew from

$ 3.24 million in 2019 to $ 4.85 million in 2024. Exh. 3, Revised Burke report of 02/12/2024, at 10.

The major expansion of damages, to include revenue from all KDI screener products, was therefore without a basis in expertise or any recognized methodology.  While the expansion may not be a mere adoption of assumptions by KDI, the expansion amounts to mere "ipse dixit," and to assertion without analysis that leaves an impermissible logical gap of the kind prohibited in *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 252 (6th Cir. 2001).  Neither damages calculation was tied to the only product that was the subject of the allegedly false statements, and the testimony thus is not based on "reliable principles and methods," that are reliably applied "to the facts of the case'" as Rule 702 requires.  *United States v. Sammons*, 55 F.4th 1062, 1072 (6th Cir. 2022) (quoting Fed. R. Evid. 702).  The unsupported assumption that there would be direct effects on other products does not suffice. "An expert whose conclusions are just 'assumptions' has not used a weak methodology; he has used no methodology at all."  *Navarro v. Procter & Gamble Co.*, 501 F. Supp. 3d 482, 494 (S.D. Ohio 2020).

## V.    CONCLUSION

For the foregoing reasons, Defendant Metrasens, Inc. respectfully asks that the Court grant its motion to exclude the testimony of KDI's expert, and further asks the Court to grant its motion to grant Defendant summary judgment in its favor on all claims of Plaintiff Kopp Development, Inc.

Dated: June 26, 2024.

 /s/ *Michael T. Smith*
Michael T. Smith (Admitted Pro Hac 8/17/2021)
BIRCH, STEWART, KOLASCH & BIRCH, LLP
8110 Gatehouse Road, Suite 100

Falls Church, VA 22042
Telephone: (703) 205-8048
Facsimile: (703) 205-8050
msmith@bskb.com
mailroom@bskb.com

James C. Carpenter (0012228)
Vincent I. Holzhall (0074901)
STEPTOE & JOHNSON PLLC
41 S. High Street, Suite 2200
Columbus, OH 43216-5028
Telephone: 614-221-5100
Fax: 614-221-0952
jim.carpenter@steptoe-johnson.com
vince.holzhall@steptoe-johnson.com

*Counsel for Defendant Metrasens, Inc.*

**Certificate of Compliance**

Pursuant to N.D. Ohio Local Rule 7.1(f), the undersigned counsel certifies that this case is on the Standard track.  (See ECF No. 22.)  The Court has granted leave for Defendant Metrasens Inc. to file its motion for summary judgment and motion *in limine* in one motion, not to exceed thirty (30) pages in length, exclusive of appendices, cover page, tables of authority, tables of contents and certificate of service.  (S*ee* Docket Text filed May 31, 2024.)  The undersigned counsel certifies that this combined motion for summary judgment and motion in limine complies with the Court's Docket Text of May 31, 2024

/s/ *Michael T. Smith*
Michael T. Smith  (Admitted Pro Hac 8/17/2021)
BIRCH, STEWART, KOLASCH & BIRCH, LLP
8110 Gatehouse Road, Suite 100
Falls Church, VA 22042
Telephone: (703) 205-8048
Facsimile: (703) 205-8050
msmith@bskb.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 26th day of June 2024, I electronically filed the foregoing documents

with the Clerk of the Court using the CM/ECF system, which will send notice of such filing to

the following:

> Robert R. Terbrack, Jr.
> Brian T. Winchester
> McNeal, Schick, Archibald & Biro 4608 St. Clair Avenue
> Cleveland, OH 44103
> (216) 621-9870
> (216) 522-1112 (facsimile)
> bobt@msablaw.com
> btw@msablaw.com

> */s/ Michael T. Smith*
> Michael T. Smith

27

20993666