## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**KOPP DEVELOPMENT, INC.,**

**CASE NO. 1:21-CV-01216-PAB**

**Plaintiff,**

**-vs-**

**JUDGE PAMELA A. BARKER**

**METRASENS, INC.,**

**Defendant.**

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court upon Defendant Metrasens, Inc.'s ("Metrasens") Motion to Exclude Testimony of Plaintiff's Damages Expert and for Summary Judgment as to All Claims, filed on June 26, 2024.  (Doc. No. 42.)  On July 25, 2024, Plaintiff Kopp Development, Inc. ("KDI") filed an Opposition.  (Doc. 45.)  On August 8, 2024, Metrasens filed a Reply.  (Doc. No. 47.)  For the following reasons, Metrasens' Motion (Doc. No. 42) is GRANTED IN PART and DENIED IN PART, as set forth herein.

## I.    Facts

This case arises from alleged misrepresentations that Metrasens made about the product of its competitor, KDI.  Metrasens and KDI both manufacture ferromagnetic detectors.  (Doc. No. 45-11, PageID# 1808.)  The purpose of such devices is to detect magnetic items (such as iron) on a person's body or clothing before the person enters a room containing an MRI scanner.  (*Id.*)  As relevant to the instant dispute, Metrasens' product is the "Metrasens Ferroguard Screener," and KDI's product is the "Kopp Ferralert Solo."  (*Id.*)

In approximately September 2018, Metrasens purchased a Kopp Ferralert Solo unit from a third-party located in Singapore.  (Doc. No. 45-19, PageID# 2216-17; Doc. No. 45-12, PageID#

1822.)  Metrasens provided the Kopp unit along with a Metrasens Ferroguard Screener unit to a

company called Intertek Testing & Certification, Ltd. ("Intertek") for comparison testing.  (*Id*. at

PageID# 2219.)  In May 2019, Intertek issued a Test Report (the "Intertek Report.")  (Doc. No.

45-11.)  The Intertek Report identified the Kopp unit as a "Kopp Ferralert Solo" containing serial

no. SL120217-01, and it identified the Metrasens' unit as a "Metrasens Ferroguard Screener"

containing serial no. SCFG-04-0159.  (*Id*. at PageID# 1809.)  The Intertek Report concluded that

"[t]he results of the testing showed that the Metrasens Ferroguard Screener had a significantly

higher detection rate than the Kopp Ferralert Solo across the range of typical target objects."  (*Id*.

at PageID# 1808.)

At some point afterward (the exact date is unclear from the record), Metrasens posted a

statement about the Intertek Report on its website (the "Statement") that provided in relevant part:

> DETECT THE RISK OTHER SYSTEMS MISS
> Independent testing-laboratory study[8] comparing the performance of Ferroguard
> Screener in detecting smaller, commonly encountered risk items, against the
> performance of the other most frequently seen whole-body FMDS [ferromagnetic
> detection systems]. . . . Only Ferroguard Screener uses Fluxgate sensors, making it
> the most sensitive FMDS available.

(Doc. No. 45-20, PageID# 2277.)  The footnote to the foregoing provided: "Intertek Testing &

Certification Performance Laboratory. (2019) Full report available from Metrasens."  (*Id*. at

PageID# 2280.)

Metrasens also created a summary of the Intertek Report (the "Summary") entitled

"**Ferromagnetic Detection Performance Comparison: Ferroguard Screener -vs- Kopp**

**Ferralert Solo.**"  (Doc. No. 45-14.)  The Summary provided in relevant part:

> Ferromagnetic detection systems (FMDS) are not all the same.  In an independent
> testing-laboratory comparison of 570 presentations of 9 typical risk items, there
> was a significant difference in the probability of items being detected, with

2

Ferroguard Screener detecting 96% of presentations for the complete risk-item set, compared with 75% probability of detection for Kopp Ferralert Solo.
 . . .

**KEY FINDING**
**For smaller risk-Items, Ferroguard Screener proved significantly more effective at detecting threats to patient and staff safety and operational performance** (94% of risk items detected) than the Kopp Ferralert Solo (56% of risk items detected).
. . .

**TESTING METHOD**
- Independent testing-laboratory[1]
- Standard, new, 2018 FMDS patient screening systems:
  Metrasens Ferroguard Screener;
  Kopp Development Ferralert Solo
- Each product set at MAX sensitivity
- Identical, 360◦ turn screening protocol

(*Id*. at PageID#1846.)  The footnote to the foregoing provided: "Intertek Testing and Certification Performance Laboratory.  (2019)  Full report available from Metrasens."  (*Id*.)  The Summary also contained two comparative charts demonstrating metrics upon which Metrasens' product outperformed KDI's product.  (*Id*.)  Below the first chart, the Summary provided:

- For the smaller ferrous items typically encountered during MR patient screening, **Ferroguard Screener detected 94% vs just 56% by Kopp Ferralert Solo**.

- **Kopp Ferralert Solo missed significantly more ferrous risk-items at every body location tested,** most especially at the feet area where detection performance was <50% that of Ferroguard Screener.

(*Id*.)  On July 29, 2019, Colin Robertson, Metrasens' Senior Vice President of Sales & Marketing, emailed the Summary to Metrasens' sales team and told them to "feel free to share with customers and distributors/partners."  (Doc. No. 45-18, PageID# 2137.)  Mr. Robertson concluded his email as follows:

I believe that the hard data and messaging we now have in place around detection of risk items other systems miss, and peer-reviewed evidence of implant detection

3

efficacy, gives us all the opportunity to significantly grow the Ferroguard Screener business, and blow Kopp's product out of the water!

(*Id*.)

KDI's Owner, Keith Kopp, testified (on behalf of KDI as a Rule 30(b)(6) witness) that the Ferralert Solo unit that Intertek tested was an early prototype from when the product was first released in 2012.  (Rule 30(b)(6) Deposition of Keith Kopp ("Kopp 30(b)(6) Depo. I"), Doc. No. 45-23, at Tr. 20:25-21:9.)  Mr. Kopp further testified that KDI had made several improvements to the Ferralert Solo product since 2012.  (*Id*. at Tr. 20:15-20:24, 38:22-39:11, 40:3-41:17).  At some time "prior to Christmas" in 2020, Mr. Kopp and Metrasens' CEO and co-founder, Simon Goodyear, had a conversation about the Intertek Report.  (Doc. No. 45-21, PageID# 2283.)  Mr. Kopp told Mr. Goodyear that the Ferralert Solo unit that Intertek tested was an "old" version.  (*Id*.)  On January 25, 2021, Mr. Goodyear responded by email to Mr. Kopp's assertion.  (*Id*. at PageID# 2282-84.)  Mr. Goodyear wrote, in relevant part:

> Although I have been unable to confirm the manufacturing date of the product, we believe the comparative study was fair, with a current version of your product, available on the market at the time.  However, if you are willing to confirm the age of the product and indicate evidence of modifications or upgrades to the commercially available system at that time that you believe would impact the detection results then Metrasens would be agreeable to resubmit the latest Metrasens Screener product to be tested by Intertek alongside a recently manufactured Ferralert Solo product.  Should the conclusions of the new report be substantially different from their last report then Metrasens would withdraw the previous Intertek report from circulation on our website.

(*Id*. at PageID# 2283.)  On January 26, 2021, Mr. Kopp replied via email to Mr. Goodyear, writing, in relevant part:

> I must confess . . . that your response was very unsatisfactory.  You admit that your [sic] were unable to confirm the manufactured date of our detector.  Yet on your literature under Intertek TEST METHOD, you stated the following:
>
> "Standard, new 2018 FMDS patient screening systems:

4

> Metrasens Ferroguard Screener:
>
> Kopp Development Ferralert Solo."
>
> The Intertek test report did indicate the serial number of our product.  The FerrAlert® Solo tested was manufactured in 2012.  By your own admission, you did not now [sic] the date of manufacture yet you claimed that it was new, standard and a 2018 model.  We take the publishing of knowingly false information very seriously since it has damaged our reputation and potentially cost us sales.

(*Id*. at PageID# 2281.)  Metrasens' Statement and its Summary (collectively, Metrasens' "advertisements") remained on its website until approximately September 1, 2023.  (Doc. No. 40-1, PageID# 1290.)

KDI contends that Metrasens' advertisements negatively affected its business.  First, Mr. Kopp testified that KDI lost business from two potential customers—Philips Healthcare and MD Anderson—and from an existing customer—the University of Pittsburgh Medical Center ("UPMC").  (Kopp 30(b)(6) Depo. I, Doc. No. 45-23, at Tr. 112:17-116:16, 154:23- 158:12, 166:7- 167:12.)  KDI also produced email correspondence from Philips Healthcare and UPMC that it contends reflects these potential and existing customers' knowledge of the Intertek Report and with or from it, their concern about it.  (Doc. No. 45-13, PageID# 1826, 1829-1845.)  Second, Mr. Kopp testified that Metrasens' advertisements negatively impacted KDI's income based on the difference between KDI's forecasted and actual sales.  (Doc. No. 45-3; Kopp 30(b)(6) Depo. I, Doc. No. 45-23, Tr. at 92:9-22.)  Mr. Kopp estimated that KDI's total damages from 2019 through 2022 were $7,649,000.  (Doc. No. 45-3.)  Third, KDI retained an economist, John F. Burke, Jr., Ph.D. ("Dr. Burke"), to provide an expert opinion on the amount of its economic loss.  (Doc Nos. 45-9 and 45-7).  In his revised report dated February 12, 2024, Dr. Burke opined "with reasonable

5

economic certainty that the revised total losses to KDI equal $8,584,332 in present value." (Doc. No. 45-7, PageID# 1769.)

## II.    Procedural History

On June 21, 2021, KDI filed a Complaint against Metrasens asserting the following six Claims for Relief: (1) tortious interference with business relations (Count I); (2) negligent misrepresentation (Count II); (3) defamation (Count III); (4) false advertising under the Lanham Act (Count IV); (5) patent infringement (Count V); and (6) declaratory judgment of noninfringement (Count VI). (Doc. No. 1.) Regarding Counts I through IV, KDI alleges that it has been damaged by loss of income and damage to its reputation as a direct result of Metrasens' publishing, marketing, or advertising of false information regarding KDI's products. (*Id*. at ¶¶ 43, 48, 54.) In addition to money damages, KDI requests an order enjoining Metrasens from "publishing advertising, marketing and/or promoting any false or misleading information regarding [KDI's] products." (*Id*. at Prayer for Relief.)

On August 26, 2021, Metrasens moved to dismiss KDI's claim for declaratory judgment of noninfringement (Count VI) pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. (Doc. No. 12.) On October 12, 2021, the Court conducted a Case Management Conference, at which time various case management deadlines were set. (Doc. No. 22.) On February 28, 2022, the Court granted Metrasens' Motion to Dismiss and dismissed Count VI. (Doc. No. 23.)

The parties submitted Claims Construction Briefing regarding KDI's patent infringement claim (Count V) in March and April 2022. (Doc. Nos. 24, 25, 26, 27.) Rather than proceed directly to a Claim Construction Hearing, however, the parties requested a referral to mediation after being permitted to conduct written fact discovery and depositions the parties deemed necessary for

6

purposes of participating in the mediation. (Doc. No. 29.) The Court agreed, and subsequently extended the fact discovery deadlines, first to December 5, 2022, and then to January 27, 2023. In February 2023, however, the Court was advised that on January 9, 2023, the Patent Trial and Appeal Board ("PTAB") had instituted *inter partes* review of the patent in suit and, at the request of the parties, this Court stayed KDI's patent claims. *See* Non-Doc Order dated Feb. 7, 2023. The parties indicated that that they intended to engage a private mediator to attempt a "global resolution" of both KDI's patent and tort claims. *Id*. To accommodate the parties' request, the Court extended the case management deadlines. *See* Non-Doc Orders dated November 27, 2023, and February 27, 2024.

On June 26, 2024, the parties filed a Joint Stipulation of Dismissal regarding KDI's claim for patent infringement (Count V), which the Court approved on June 27, 2024. (Doc. Nos. 41, 43.) Thus, KDI's remaining claims against Metrasens are for tortious interference, negligent misrepresentation, defamation, and false advertising under the Lanham Act (Counts I through IV).

On June 26, 2024, Metrasens filed a Confirmation of Discontinuance of Use or Disclosure of Disputed Report (the "Confirmation") (Doc. No. 40.) Attached to the Confirmation was a Declaration from Mr. Goodyear, Metrasens' CEO and co-founder, who averred that Metrasens had removed the Summary and all references to the Intertek Report from its website by as early as September 1, 2023. (Doc. No. 40-1, PageID# 1290.)

On June 26, 2024, Metrasens also filed a Motion to Exclude Expert Testimony of Plaintiff's Damages Expert and for Summary Judgment as to All Claims. (Doc. No. 42.) On July 25, 2024, KDI filed its Brief in Opposition, to which Metrasens replied on August 8, 2024. (Doc. Nos. 45, 47.) On August 16, 2024, KDI filed a Motion for Leave to File Sur-Reply Instanter. (Doc. No.

49.) On August 19, 2024, the Court granted KDI's Motion for Leave in part and denied it in part. *See* Non-Doc Order dated August 19, 2024. The Court precluded KDI from filing a Sur-Reply, but found that, to the extent Metrasens raised new arguments in its Reply, the Court would not consider them. (*Id.*)

On October 2, 2024, the Court conducted a status conference with counsel, at which time it set a Final Pretrial for February 11, 2025, and the Trial for March 18, 2025. (Doc. No. 50.)

## III. Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party." *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 487 (6th Cir. 2006) (citing *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 451 (6th Cir. 2004)). "Thus, 'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). A fact is "material" only "if its resolution might affect the outcome of the suit under the governing substantive law." *Henderson*, 469 F.3d at 487 (citing *Hedrick*, 355 F.3d at 451).

At the summary judgment stage, "[a] court should view the facts and draw all reasonable inferences in favor of the non-moving party." *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 628 (6th Cir. 2018) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "[T]he moving party bears the initial burden of showing that there is no genuine dispute

of material fact." *Ask Chems., LP v. Comput. Packages, Inc.*, 593 F. App'x 506, 508 (6th Cir. 2014) (citing *Anderson*, 477 U.S. at 256).  The moving party may satisfy this initial burden by "identifying those parts of the record which demonstrate the absence of any genuine issue of material fact." *Lindsey v. Whirlpool Corp.*, 295 F. App'x 758, 764 (6th Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  "[I]f the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial," the moving party may also "meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's case.'" *Id*. (quoting *Celotex*, 477 U.S. at 325).

Once the moving party satisfies its burden, "the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a genuine dispute of material fact for trial." *Ask Chems.*, 593 Fed. Appx at 508–09 (citing *Anderson*, 477 U.S. at 256).  "[T]he nonmoving party may not simply rely on its pleading but must 'produce evidence that results in a conflict of material fact to be solved by a jury.'" *MISC Berhad v. Advanced Polymer Coatings, Inc.*, 101 F. Supp.3d 731, 736 (N.D. Ohio 2015) (quoting *Cox*, 53 F.3d at 150)

## IV.  Analysis

Metrasens asserts three arguments in support of its Motion.  (Doc. No. 42.)  First, Metrasens contends that KDI's request for injunctive relief is moot because Metrasens (1) removed the Intertek Report and all references thereto from its website; and (2) agreed not to use the Intertek Report or its information in the future.  (*Id*. at PageID#1310.)  Second, Metrasens contends that KDI cannot show a genuine issue of material fact regarding the *existence* of KDI's damages and there is none.  (*Id*. at PageID# 1312.)  Specifically, Metrasens argues that since KDI's expert, Dr. Burke was not tasked with opining on damages, KDI "must look elsewhere for evidence."  (*Id. at*

9

PageID# 1313.)  And, according to Metrasens, KDI has not (1) produced any surveys or other evidence of harm to its goodwill; (2) identified any evidence that it lost a single customer or sale; (3) or identified any customers or potential customers who chose not to purchase KDI's product because of the Intertek Report.  (*Id.*)  Third, Metrasens contends that there is no genuine issue of material fact regarding the *amount* of KDI's damages.  (*Id*. at PageID# 1312.)  Specifically, Metrasens argues that the testimony of KDI's damages expert, Dr. Burke, should be excluded as unreliable under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).  (*Id*. at PageID# 1315.)  Alternatively, Metrasens argues that Dr. Burke's testimony should be excluded because his reports calculate damages associated with KDI-products that the Intertek Report did not mention.  (*Id*. at PageID# 1320-21.)

KDI opposes Metrasens' Motion for several reasons.  (Doc. No. 45.)  Regarding the existence of damages, KDI contends that damages should be presumed for its false-advertising claim under the Lanham Act because Metrasens targeted KDI with a false advertisement that Metrasens knew to be false.  (*Id*. at PageID# 1641-44.)  Alternatively, KDI contends that even if there is no presumption of damages, the record raises a genuine issue of material fact that Metrasens proximately caused damage to KDI.  (*Id*. at PageID# 1644-53.)  Specifically, KDI points to evidence indicating that it (1) lost business from Philips Healthcare, MD Anderson, and UPMC; and (2) experienced reduced revenue.  (*Id*. at PageID# 1645-53.)  Regarding the amount of damages, KDI contends that Dr. Burke's report should not be excluded under *Daubert* because his methods are reliable.  (*Id*. at PageID# 1653.)  Alternatively, KDI contends that even if Dr. Burke is prohibited from offering opinions on causation or the calculation of KDI's losses, his testimony is still relevant to explain the "capitalization" of KDI's damages.  (*Id*. at PageID# 1657.)

10

Lastly, KDI contends that it still requests injunctive relief and is not required to accept Metrasens'

word that it will no longer use the Intertek Report. (*Id*. at PageID# 1661.)

## A. Existence of Damages

The Court begins by considering Metrasens' argument that there is no genuine issue of

material fact regarding the existence of KDI's damages. (Doc. No. 42, PageID# 1312-13.)

### 1. False Advertising under the Lanham Act

The Court will first consider Metrasens' existence-of-damages argument in relation to

KDI's false-advertising claim under the Lanham Act (Count IV). The Lanham Act provides in

relevant part as follows:

> (1) Any person who, on or in connection with any goods or services, or any
> container for goods, uses in commerce any word, term, name, symbol, or device,
> or any combination thereof, or any false designation of origin, false or
> misleading description of fact, or false or misleading representation of fact,
> which—
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the
> affiliation, connection, or association of such person with another person, or as
> to the origin, sponsorship, or approval of his or her goods, services, or
> commercial activities by another person, or
>
> (B) in commercial advertising or promotion, misrepresents the nature,
> characteristics, qualities, or geographic origin of his or her or another person's
> goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is
> likely to be damaged by such act.

15 U.S.C. § 1125(a). In order to establish a false-advertising claim under the Lanham Act, the

plaintiff must establish the following five elements: (1) "'the defendant has made false or

misleading statements of fact concerning his own product or another's;'" (2) "'the statement

actually or tends to deceive a substantial portion of the intended audience;'" (3) "'the statement is

11

material in that it will likely influence a deceived consumer's purchasing decisions;'" (4) "'the advertisements were introduced into interstate commerce;'" and (5) "'there is some causal link between the challenged statements and harm to the plaintiff.'" *Balance Dynamics Corp. v. Schmitt Indus.*, 204 F.3d 683, 689 (6th Cir. 2000) (quoting *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 613 (6th Cir. 1999)). The Sixth Circuit has explained that "[t]he third and fifth elements–deception and injury—are both components of causation generally." *Am. Council*, 185 F.3d at 614. "The deception element asks whether the defendant's misstatements caused the consumer to be deceived." *Id.* "The injury element asks whether the defendant's deception of the consumer caused harm to the plaintiff." *Id.*

Metrasens does not set forth the foregoing elements in its Motion, much less clearly identify which one(s) it is challenging on summary judgment. (Doc. No. 42, PageID# 1312-15.) However, Metrasens' Motion discusses the "existence of any damages," the "fact of damages," and causation, all of which implicate the third and fifth elements of a Lanham Act claim. (*Id.* at PageID# 1298, 1301, 1312, 1313, 1315.) KDI's Opposition addresses whether Metrasens caused damage to KDI. (Doc. No. 45, PageID# 1635, 1644, 1647, 1648, 1653, 1654, 1657, 1658, 1660.) Thus, and in light of the interrelationship between the third and fifth elements, the Court construes Metrasens' Motion as challenging the third and fifth elements of a Lanham Act claim, i.e., whether Metrasens' advertisements caused consumers to be deceived and, if so, whether that deception caused injury to KDI. *See Am. Council*, 185 F.3d at 614.

The damages to which a plaintiff may be entitled under the Lanham Act are set forth in 15 U.S.C. § 1117, in relevant part, as follows:

> When . . . a violation under § 1125(a) . . . of this title, . . . shall have been established in any civil action arising under this chapter, the plaintiff shall be

12

> entitled . . . subject to the principles of equity, to recover (1) defendant's profits,
> (2) **any damages sustained by the plaintiff**, and (3) the costs of the action.

(emphasis added).  The causation standard in a false-advertising claim is a proximate causation standard.  *Campfield v. Safelite Group, Inc.*, 91 F.4th 401 (6th Cir. 2024).  In *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014), the Supreme Court of the United States held that (1) "a plaintiff suing under § 1125(a) [of the Lanham Act] ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising"; and (2) "that occurs when deception of consumers causes them to withhold trade from the plaintiff." *Id*. at 133.  The Court explained as follows:

> Proximate-cause analysis is controlled by the nature of the statutory cause of action. The question it presents is whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits.
>
> Put differently, the proximate-cause requirement generally bars suits for alleged harm that is "too remote" from the defendant's unlawful conduct.  That is ordinarily the case if the harm is purely derivative of 'misfortunes visited upon a third person by the defendant's acts." *Holmes[ v. Securities Investor Protection Corp.*, 503 U.S. 258, 268-269 (1992)].  In a sense, of course, all commercial injuries from false advertising are derivative of those suffered by consumers who are deceived by the advertising; but since the Lanham Act authorizes suit only for commercial injuries, the intervening step of consumer deception is not fatal to the showing of proximate causation required by the statute.  That is consistent with our recognition that under common-law principles, a plaintiff can be directly injured by a misrepresentation even where "a third party, and not the plaintiff, . . . relied on" it. *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 656 . . . (2008).

*Id*. (internal citations omitted).  The Court described the "'classic Lanham Act false-advertising claim'" as one "in which "'one competitor[r] directly injur[es] another by making false statements about his own goods [or the competitor's goods] and thus inducing customers to switch.'" *Id*. at 137-38 (quoting *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 799, n. 24 (5th Cir.

2011)).  However, the Court explained that reputational harm was an additional "type of injury cognizable under § 1125(a)":

> When a defendant harms a plaintiff's reputation by casting aspersions on its business, the plaintiff's injury flows directly from the audience's belief in the disparaging statements.  Courts have therefore afforded relief under § 1125(a) not only where a defendant denigrates a plaintiff's product by name, but also where the defendant damages the product's reputation by, for example, equating it with an inferior product.  Traditional proximate-causation principles support those results: As we have observed, a defendant who "'seeks to promote his own interests by telling a known falsehood to or about the plaintiff or his product'" may be said to have proximately caused the plaintiff's harm.  [*Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S., 639, 657 (2008)] (quoting Restatement (Second) of Torts § 870, Comment *h* (1977); emphasis added in *Bridge*).

*Id*. at 138 (internal citations omitted).  The Court concluded that "[t]o invoke the Lanham Act's cause of action for false advertising, a plaintiff must plead (and ultimately prove) an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations."  *Id*. at 140.  The Sixth Circuit has characterized damages such as "lost sales, lost profits, or loss of goodwill" as "marketplace damages."  *Balance Dynamics*, 204 F.3d at 690-91.

### a.       Presumption of Damages

The Court notes that KDI's Opposition and Metrasens' Reply devote considerable discussion to whether KDI is entitled to a presumption of damages for its Lanham Act claim.  (Doc. No. 45, PageID# 1642-44; Doc. No. 47, PageID# 2576-2582.)   Many courts have adopted presumptions for elements of a Lanham Act claim.  *See* 1 Charles E. McKenney & George F. Long, III, *Federal Unfair Competition: Lanham Act 43(a)*, § 6:1 (Oct. 2024).  The Sixth Circuit has followed the lead of other circuits and adopted a presumption of damages under certain circumstances, which it has described as follows:

14

> [F]or purposes of comparative advertising, we have recognized a limited exception to the general rule that a false-advertising plaintiff must prove damages. In *Balance Dynamics Corp. v. Schmitt Industries, Inc.*, we adopted the reasoning of an Eighth Circuit case that presumed damages in instances of willful deception. 204 F.3d 683, 694-95 (6th Cir. 2000) (quoting *Porous Media Corp. v. Pall Corp.*, 110 F.3d 1329, 1336 (8th Cir.1997)). We stressed, however, that the presumption "extend[s] only to cases of comparative advertising where the plaintiff's product was specifically targeted," explaining that "[o]therwise . . . 'a plaintiff might enjoy a windfall from a speculative award of damages by simply being a competitor in the same market.'" *Id*. at 694 (quoting *Porous Media*, 110 F.3d at 1334-35). Recognizing this boundary, we found the presumption overcome by evidence of no marketplace injury. *Id*. at 695.

*Innovation Ventures, LLC v. Bhellion Enters. Corp.*, 529 F. App'x 560, 566 (6th Cir. 2013). *See also Ethicon Endo-Surgery, Inc. v. Hologic, Inc.*, 689 F. Supp. 2d 929, 943 (S.D. Ohio 2010); *A.L.S. Ents., Inc. v. Robinson Outdoor Prods., LLC*, 2017 WL 393307 at *6 (W.D. Mich. Jan. 30, 2017); *Louisiana-Pac. Corp. v. James Hardie Bldg. Prod., Inc.*, 335 F. Supp. 3d 1002, 1016 (M.D. Tenn. 2018), *aff'd*, 928 F.3d 514 (6th Cir. 2019); *ACT Inc. v. Worldwide Interactive Network*, 2020 WL 12574239 at *33 (E.D. Tenn. March 10, 2020).

KDI argues that marketplace damages should be presumed for its Lanham Act claim because there is evidence of willful deception and specific targeting of customers or consumers. (Doc. No. 45, PageID# 1641-44.) And KDI argues that even if this Court is not satisfied that the evidence demonstrates that Metrasens intended to deceive prospective customers, Metrasens' actions in allowing the false advertisement to remain, without verifying whether the KDI product was current, shows that Metrasens engaged in reckless conduct, and willful conduct has been interpreted to include reckless conduct. (*Id.* at PageID # 1643-44.) Alternatively, KDI argues that even if this Court concludes that the presumption of damages does not apply, the record sufficiently demonstrates that Metrasens caused damage to KDI and at a minimum creates a genuine issue of material fact as to whether Metrasens proximately caused injury to KDI that should be decided by

a jury.  (*Id*. at PageID# 1644-53.)  Metrasens counters that the presumption of damages does not apply because KDI cannot show literal falsity and bad faith.  (Doc. No. 47, PageID# 2576-82.)  Alternatively, Metrasens argues that if even if the presumption does apply, KDI still cannot show an injury in fact.  (*Id*. at PageID# 2582-90, 2595.)

For the following reasons, the Court finds that it is not necessary to determine the applicability of the presumption of damages to resolve Metrasens' Motion.  Regardless of whether the presumption of damages applies, the Court must still determine whether there is a genuine issue of material fact regarding KDI's actual damages.  Specifically, even if the Court were to determine that the presumption applies, it must still determine whether Metrasens has rebutted the presumption by demonstrating the absence of actual damages.  *See Innovation Ventures*, 529 F. App'x at 566.  Moreover, the presumption would not apply to KDI's three non-Lanham Act claims.  The Court acknowledges that KDI, in its Brief in Opposition, requests that the Court find that "Metrasens' conduct warrants a presumption of damages whereby Metrasens will bear the burden at trial to prove that it did not cause damage to KDI and further bear the burden of disproving the damages asserted by KDI."  (Doc. No. 45, PageID#1644.)   However, KDI has not filed a motion seeking such relief.  Courts have held that it is improper to ask a court for affirmative rulings in a response brief opposing a motion for summary judgment.  *See Douglas v. Pere Marquette Shipping Co.*, 2015 WL 5159432 at *3 (E.D. Mich. Sept. 2, 2015).  Accordingly, the Court will proceed to determining whether there is a genuine issue of material fact regarding KDI's actual damages.

### b.    Actual Damages

The parties dispute whether there is a genuine issue of material fact that Metrasens caused marketplace damages to KDI.  (Doc. No. 42, PageID# 1313-15; Doc. No. 45, PageID# 1644-53.)

16

KDI identifies its marketplace damages as lost business from Philips Healthcare, MD Anderson, and UPMC, as well as reduced revenue.  (Doc. No. 45, PageID# 1644-53).  The Court will address each item and the evidence relating thereto in turn.

### i.      Philips Healthcare

KDI contends that there is genuine issue of material fact as to whether Metrasens' advertisements (i.e., the Intertek Report and Summary) proximately caused it to lose business from Philips Healthcare ("Philips"), a potential customer.   The evidentiary record contains email correspondence from May through October 2020 between John Vassallo, Philips' Global Commodity Manager, and Anna Srb, KDI's Director of Marketing and Sales.  (Doc. No. 42-1, PageID# 1428-36.)  At the time of the email correspondence, Philips had an exclusive arrangement with Metrasens.  (("Kopp 30(b)(6) Depo. I"), Doc. No. 45-23, at Tr. 159:11-22.)  On May 5, 2020, Mr. Vassallo sent an email to KDI, writing that he was interested in receiving an introduction to KDI and its "solutions related to ferromagnetic detection in MRI installations."  (Doc. No. 42-1, PageID# 1436.)  On May 6, 2020, Ms. Srb responded with links to videos and brochures about three of KDI's products, including the Kopp Ferralert Solo.  (*Id.* at PageID# 1435.)

On May 24, 2020, Mr. Vassallo responded that he had had "an opportunity to review the literature" and that he had "a few questions related to comparative analysis."  (*Id.* at PageID# 1434.)  He wrote that "Ferroguard Screener – a competitor product by Metrasens, claims on their website to perform better than competition when it comes to [d]etection comparison of smaller risk items."  (*Id.*)  Mr. Vassallo copied and pasted a comparative chart from the Summary into his email and asked whether KDI had "comparative data studies for implant detection efficacy."  (*Id.*)  On May 29, 2020, Ms. Srb responded that Metrasens' claims were "unsubstantiated" and that

Metrasens was "notorious for making false claims." (*Id*. at PageID# 1433.) She wrote that KDI has never supplied Intertek with samples of its products or granted permission for any type of testing. (*Id*.)

Ms. Srb followed up with Mr. Vassallo on May 30 and June 12, 2020. (*Id*. at PageID# 1432.) On June 14, 2020, Mr. Vassallo confirmed his receipt of Ms. Srb's prior emails. (*Id*.) He wrote that he understood KDI "contests the independent study results as promoted by Metrasens" and that he did not wish to get into that discussion. (*Id*.) He requested a "comparative study (if available)" comparing KDI's "ferromagnetic detection systems" to Metrasens' "equivalent." (*Id*.) On June 15, 2020, Ms. Srb responded with a quote for the Kopp Ferralert Solo and another product. (*Id*.) She wrote that "[n]o comparative, independent study between our FerrAlert and the competitive Ferroguard products presently exists." (*Id*.)

Ms. Srb followed up with Mr. Vassallo on July 14 and September 25, 2020. (*Id*. at PageID# 1431-32.) On September 25, 2020, Mr. Vassallo responded that while "[p]erformance of the detector must be the number one consideration, considering the safety relevance of this equipment, if we were to assume for a moment, that [KDI]'s performance is proven to be at least at par with the Metrasens equivalent, then I am afraid that the Kopp proposal would unfortunately not compete on price." (*Id*. at PageID #1431.) He advised that to consider KDI's offer, KDI would have to reduce its price by at least $1,000, and the price had to include "installation cost and transport." (*Id*.)

On September 29, 2020, Ms. Srb inquired whether Philips would provide installation in exchange for KDI providing free training. (*Id*. at PageID# 1430.) On October 4, 2020, Mr. Vassallo declined Srb's counteroffer, concluding "unless we can find a way on price issue, I do not

see a way how we can go any further at this stage." (*Id*.)  On October 5, 2020, Ms. Srb asked Mr. Vassallo how many systems Philips expected to sell per year.  (*Id*.)  On the same day, Mr. Vassallo responded that Philips sold 500 in 2019 and 300 so far in 2020 and that it expected to sell between 300 to 400 in 2021.  (*Id*.)  On October 6, 2020, Ms. Srb replied, "With these approximate numbers in mind, attached please find the revised price list."  (*Id*. at PageID# 1429.)  The "revised price list," however, is not included in the record before this Court.  (*Id*.)

Ms. Srb followed up with Mr. Vassallo on October 19, 2020.  (*Id*. at PageID# 1429.)  On October 28, 2020, Mr. Vassallo responded that he had shared the price information "with Business" and would contact her "should there be an interest to explore further."  (*Id*.)  The record does not include any evidence that Mr. Vassallo or anyone from Philips ever contacted KDI again, and Mr. Kopp testified that Philips and KDI never proceeded any further.  (Rule 30(b)(6) Deposition of Keith Kopp ("Kopp 30(b)(6) Depo. II"), Doc. No. 45-24, at Tr. 29:12-16.)

Metrasens argues that the foregoing evidence shows that Philips' decision not to purchase from KDI was based on price.  (Doc. No. 42, PageID# 1302, 1322.)  KDI counters that despite its meeting of Philips' price demand, Philips purchased from Metrasens.  (Doc. No. 45, PageID# 1649.)[1]  And KDI responds by citing to Mr. Kopp's testimony (on behalf of KDI) that "[e]ven though the pricing issue was off the table, the – the document that was actually imbedded in the email-string held sway with the Philips people, and so as such, we didn't proceed any further."  (*Id*.; Rule 30(b)(6) Deposition of Keith Kopp ("Kopp 30(b)(6) Depo. II"), Doc. No. 45-24, at Tr. 29:12-16).  In its Reply, Metrasens argues that it is "impossible to tell whether price, quality,

---

[1] KDI cites to the May 29, 2024 deposition of Mr. Kopp, at Tr. 28:10-29:16 in support of this assertion.  However, the Court's review of this portion of Mr. Kopp's deposition demonstrates only that Mr. Kopp testified that "there is evidence that Philips was, again placing orders with Metrasens."  (Doc. No. 45-24, PageID # 2552.)  However, there is no indication about, and KDI does not point to, what "evidence" demonstrated this.

inertia, third-party customer preference, or other factors controlled the Philips decision not to change its relationship." (Doc. No. 47, PageID# 2587.) Metrasens further argues that Mr. Kopp's cited testimony is based on inadmissible hearsay that the Court may not properly consider on summary judgment. (*Id*. at PageID# 2588.)

The Court finds that the record does not demonstrate that there is a genuine issue of material fact regarding KDI's claim that it suffered damages from the alleged loss of business from prospective customer, Philips. Here, there is no dispute that Mr. Vassallo's May and June 2020 emails reference the Summary. (Doc No. 42-1, PageID# 1432, 1434.) And there is no dispute that Philips did not ultimately purchase from KDI. However, Mr. Vassallo's latest emails in September and October of 2020 reference price instead of the product comparison findings. Specifically, Mr. Vassallo acknowledged his receipt of the revised price list, that he had shared it "with Business" and he would contact Ms. Srb "should there be an interest to explore further." (Doc. No. 42-1, at PageID # 1429-30.) Moreover, KDI's "revised price list" is not part of the record, and therefore, its exact terms are unknown. And there is no evidence concerning the pricing associated with any alleged purchase of product from Metrasens to allow the Court to compare the pricing.

Additionally, Metrasens is correct that Mr. Kopp's testimony is hearsay and inadmissible to create a genuine issue of material fact as to damages associated with Philips' decision not to purchase from KDI. *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). The Sixth Circuit has held that "[a] party opposing a motion for summary judgment cannot use hearsay or other inadmissible evidence to create a genuine issue of material fact." *Sperle v. Michigan Dept. of Corrections*, 297 F.3d 483, 495 (6th Cir. 2002). Notably, courts have held that the fact that a witness is a Rule 30(b)(6) designee does not create a hearsay exception allowing the witness to

20

simply repeat statements made by others if those statements are offered for their truth. *See Cooley v. Lincoln Elec. Co.*, 693 F. Supp. 2d 767, 791 (N.D. Ohio 2010). This is especially true when there is no independent evidentiary basis that might otherwise prove the truth of the hearsay, such as corroborating testimony from the hearsay declarant. *Id*. at 792.

Accordingly, and for all the reasons set forth above, the Court finds that the record does not demonstrate a genuine issue of material fact regarding KDI's claim that it suffered damages from the loss of business from Philips as a result of Metrasens' allegedly false advertisements.

### ii.    MD Anderson

KDI next contends that there is a genuine issue of material fact that Metrasens' advertisements proximately caused it to lose business from MD Anderson, another potential customer. The evidence regarding MD Anderson appears to come from ETS-Lindgren, which is one of KDI's OEM (i.e., original equipment manufacturer) partners. (Kopp 30(b)(6) Depo. I, Doc No. 45-23, Tr. at 166:11-14.) On August 24, 2020, Jim Mueth, the Manager of Specialty Healthcare Sales at ETS-Lindgren, sent an email to Ms. Srb that provided in relevant part:

> Have you by chance seen this attached document that Metrasens has out there? Have a customer shopping between our unit and theirs who just sent this to me and I would like to send a response if you can offer any contradiction of what they are claiming.
>
> They are making a decision as soon as today so anything you can offer would be greatly appreciated.

(Doc. No. 45-13, Page ID# 1827.) The attachment to Mr. Mueth's email was the Summary. (*Id*. at PageID# 1828.) Mr. Kopp testified (on behalf of KDI) that the customer at issue was MD Anderson. (Kopp 30(b)(6) Depo. I, Doc No. 45-23, Tr. at 166:10-16). He further testified that MD Anderson was "potentially going to buy something close to a million dollars' worth of

21

detectors." (*Id.* at Tr. 166:16-18.)  However, KDI was "basically told through [ETS-] Lindgren that, no they're going to go with Metrasens because of this report." (Tr. at 166:19-21)

Metrasens argues that there is no genuine issue of material fact because Mr. Kopp (1) confirmed that he had no knowledge that anyone at MD Anderson notified KDI that false advertising was the deciding factor in the sale; and (2) provided no other information on the potential sale to MD Anderson. (Doc. No. 42, PageID# 1314.)  Metrasens further argues that Mr. Kopp's testimony is inadmissible hearsay.  (Doc. No. 47, PageID# 2589.)  KDI counters that "[g]iven the email and the testimony, [a] reasonable juror would recognize this as the equivalent of the ETS representative confirming the false advertisement went directly to a customer and was further promulgated through the MRI screener industry." (Doc. No. 45, PageID# 1651.)

The Court finds that the record fails to demonstrate a genuine issue of material fact in relation to MD Anderson.  Here, KDI relies on the purported truth of Mr. Kopp's 30(b)(6) testimony.  However, Mr. Kopp appears to be repeating statements that an unidentified person at ETS-Lindgren made to an unidentified person at KDI.  There is no corroborating testimony in the record from someone with personal knowledge.  Accordingly, the Court finds that Mr. Kopp's 30(b)(6) testimony does not create a genuine issue of material fact regarding KDI's claim that it suffered damages from the loss of business from MD Anderson as a result of Metrasens' allegedly false advertisements.

### iii.      University of Pittsburgh Medical Center ("UPMC")

KDI next contends that there is a genuine issue of material fact that Metrasens' advertisements proximately caused it to lose business from the University of Pittsburgh Medical

Center ("UPMC"), an existing customer.   The record indicates that on February 19, 2021, Heather

Yahn, a Project Manager at UPMC, sent an email to KDI that read:

> Kopp Development,
>
> We need to delay installation of the ferroguard [sic] system.  There is some concern
> that this unit is not the preferred system per the UPMC Radiology Leadership.
>
> We are researching the details, but we will not be able to install on Tuesday 02/23
> as scheduled.

(Doc. No. 45-5, PageID# 1762-63.)  On February 24, 2021, Ms. Srb responded by sending an email

to Ms. Yahn and several other people at UPMC to purportedly "share some of our concerns."  (*Id*.

at PageID# 1760.)  Ms. Srb wrote in relevant part that (1) "a fake document is being sent around

by our competitor Metrasens, manufacturer of Ferroguard® FMDS;" (2) the Intertek Report is "a

fraud;" and (3) KDI is "presently pursuing legal actions in response."  (*Id*. at PageID# 1760-61.)

On the same day, Ms. Yahn replied:

> This is what I received from the Radiology leadership.  They have confirmed they
> would like the FerroGuard System.  Please help me coordinate returning the
> equipment.
>
> *There are old units of the FerrAlert systems being used within UPMC.  However,
> UPMC new sites have converted to the ferro guard units which are not Kopp units
> due to advantages that this system provides.  We identified that the ferro guard unit
> follows the ACR guidelines recommended that the unit should be mounted outside
> the door prior to entering zone 4, not inside zone 4.  Also, the ferro guard unit does
> not power down compared the the [sic] ferralert system that does a 2.5 second auto
> power down when entering the room.   Thus leaving chance to miss any
> ferromagnetic object that could still exist.  The ferro guard unit also has a flux gate
> sensor that detects small ferrous objects –* **this is the only unit that provides this
> level of detection at a greater distance compared to the other unit with a low
> distance sensitivity detection which helps identify implants which the other unit
> does not.**  *This unit also meets the quality standard of ISO 9001 which is an
> international quality standard recommended by ACR.  Hoping this may justify a
> change order for the other unit.*

(*Id*. at PageID# 1759-60.) (Emphasis added in bold print.)

23

KDI argues that the bolded portion of UPMC's email "matched exactly" what Metrasens communicated in its advertisements. (Doc. No. 45, PageID# 1652.) Therefore, KDI argues, the evidence shows that Metrasens contributed to the severance of KDI's and UPMC's business relationship. (*Id*.) Metrasens counters that UPMC's list includes reasons that could be dispositive on their own, i.e., the ACR quality standard issue and the "power down" issue. (Doc. No. 47, PageID# 2590.) Therefore, Metrasens argues, KDI "offers nothing more than speculation as to the reason" for UPMC's decision. (*Id*.)

The Court finds that the record reflects a genuine issue of material fact in relation to UPMC. Although UPMC's "Radiology leadership" did not identify the source of their product comparison information, the language they employed is strikingly like the assertions in Metrasens' advertisements. Specifically, Metrasens' Statement provides in relevant part:

> DETECT THE RISK OTHER SYSTEMS MISS
> Independent testing-laboratory study comparing the performance of Ferroguard Screener in detecting smaller, commonly encountered risk items, against the performance of the other most frequently seen whole-body FMDS [ferromagnetic detection systems]. . . . Only Ferroguard Screener uses Fluxgate sensors, making it the most sensitive FMDS available.

(Doc. No. 45-20, PageID# 2277.) Similarly, UPMC's "Radiology leadership" email provides in relevant part, "The ferro guard unit also has a flux gate sensor that detects small ferrous objects – this is the only unit that provides this level of detection at a greater distance compared to the other unit with a low distance sensitivity detection which helps identify implants which the other unit does not." (Doc. No. 45-20, PageID# 2277.) Drawing the facts and inferences in the light most favorable to KDI, a reasonable jury could conclude that Metrasens made false statements to UPMC, KDI's existing customer, that led to its decision to use Metrasens' product instead of KDI's product, thereby harming KDI. *See Campfield*, 91 F.4th at 413.

24

Accordingly, the Court finds that the record demonstrates a genuine issue of material fact regarding KDI's claim that it suffered damages from its alleged loss of business from UPMC as a result of Metrasens' allegedly false advertisements.

### iv.  Reduced Revenues

Finally, KDI contends that there is a genuine issue of material fact that Metrasens' advertisements caused it to experience damages in the form of reduced revenue.  (Doc. No. 45, PageID# 1645-46.)  In support of its arguments, KDI submits a document that Mr. Kopp prepared in which he estimated "the impact the false advertising had on [KDI's] income" (hereinafter "Total Damage Estimate.")  (Doc. No. 45-3; Kopp 30(b)(6) Depo. I, Doc. No. 45-23, Tr. at 92:9-22.) Specifically, Mr. Kopp calculated the difference between KDI's forecasted sales and its actual sales.  (Doc. No. 45-3.)  The document indicates, and Mr. Kopp confirmed in his 30(b)(6) deposition, that the forecasted sales came from a document referred to as the "CIM 2016," which he described as a "Confidential Information Memorandum" that KDI prepared in 2016 in connection with a potential sale of the business.  (Doc. No. 45-3; Kopp 30(b)(6) Depo. I, Doc. No. 45-23, Tr. at 92:23-93:14.)  The Confidential Information Memorandum is part of the record. (Doc. No. 42-1, PageID# 1490-1548.)  In his Total Damage Estimate, Mr. Kopp estimated that KDI's total reduced revenue from 2019 through 2022 was $7,649,000. (Doc. No. 45-3.)

KDI argues that since Mr. Kopp is KDI's owner and the person who runs its operations, he knows most about the competition between KDI and Metrasens. (Doc. No. 45, PageID# 1646.) Therefore, his testimony is relevant to KDI's claims and should be afforded great weight.  (*Id*.) Metrasens argues that Mr. Kopp's testimony is inadmissible because it is "expert testimony" that

KDI offers "without the designation or qualification of Mr. Kopp as an expert." (Doc. No. 47, PageID# 2585.)

For the following reasons, the Court finds that there is a genuine issue of material fact in relation to KDI's alleged reduced revenue. The Court first finds that Mr. Kopp's testimony is admissible under Federal Rule of Evidence 701, which provides:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> (a) rationally based on the witness's perception;
>
> (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
>
> (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701. As the Sixth Circuit has noted, the Advisory Committee Notes to the 2000 Amendments to Rule 701 provide as follows:

> [M]ost courts have permitted the *owner or officer* of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert. Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, *but because of the particularized knowledge that the witness has by virtue of his or her position in the business*. The amendment does not purport to change this analysis.

*JGR, Inc. v. Thomasville Furniture Indust., Inc.*, 370 F.3d 519, 525 (6th Cir. 2004), quoting Fed. R. Evid. 701, Advisory Committee Notes to the 2000 Amendments (emphasis in original). In *Lativafter Liquidating Trust v. Clear Channel Communications, Inc.*, 345 F. App'x 46 (6th Cir. 2009), the Sixth Circuit permitted an investor and member of a company's board of directors to testify about the company's value and projected value without first qualifying as an expert. *See id*. at 51. Quoting from the Advisory Committee's notes, the Sixth Circuit reasoned that "[a]s an

investor who researched [the plaintiff company's] financial condition, and later as a member of [the company's] board, [the witness] had personal, particularized knowledge of [the company's] value." *Id*. The court also found that the witness's "testimony rested on a sufficient foundation— his personal research into [the company's] financial reports." *Id*. *Accord Innovation Ventures, LLC v. NVE, Inc.*, 90 F. Supp. 3d 703, 733-34 (E.D. Mich. 2015).

The Court finds that Mr. Kopp's testimony is admissible as lay opinion testimony. First, it is rationally based upon Mr. Kopp's personal knowledge, as derived from his review of KDI's actual and projected sales. *See* Fed. R. Evid. 701(a). Second, his proposed testimony is helpful to the determination of a fact at issue. *See* Fed. R. Evid. 701(b). Third, the Court finds that Mr. Kopp's testimony is "not based upon scientific, technical, or other specialized knowledge within the scope of Rule 702," but is instead based upon his own "particularized knowledge," i.e., his familiarity with KDI's sales trends based upon his management of the company. Therefore, the Court concludes that Mr. Kopp's evidence is admissible under Rule 701.

 The Court further finds that, viewing Mr. Kopp's testimony regarding KDI's reduced revenue in conjunction with the evidence discussed above regarding KDI's loss of business with UPMC, the record demonstrates a genuine issue of material fact regarding whether Metrasens' advertisements caused KDI to experience damages in the form of reduced revenue for purposes of its Lanham Act claim.

### 2.     Ohio Tort Claims

The Court will next briefly consider Metrasens' existence-of-damages argument in relation to KDI's claims for tortious interference with business relations (Count I), negligent misrepresentation (Count II), and defamation (Count III). The parties agree that (1) these claims

are torts governed by Ohio common law, (2) each claim requires proof of damages and causation, and (3) the analysis of those issues is the same as KDI's Lanham Act claim. (Doc. No. 42, PageID# 1312-13; Doc. No. 45, PageID# 1647.) Therefore, as the Court concludes that the record demonstrates that there is a genuine issue of material fact regarding the existence of damages for KDI's Lanham Act claim, the same is true with respect to KDI's Ohio tort claims.

For the foregoing reasons, the Court denies Metrasens' Motion regarding the existence of KDI's damages for both its Lanham Act claim (Count IV) and its Ohio tort claims (Counts I through III).

### B.     Amount of Damages

The Court will next consider Metrasens' argument that there is no genuine issue of material fact regarding the amount of KDI's damages. (Doc. No. 42, PageID# 1302, 1312.) Metrasens' argument is premised on the exclusion of Dr. Burke's testimony. Specifically, Metrasens requests that the Court exclude Dr. Burke's testimony as unreliable under Rule 702 of the Federal Rules of Evidence and *Daubert*. (*Id*. at PageID# 1315-22.) Alternatively, Metrasens requests that the Court exclude Dr. Burke's testimony because he calculated damages for products not mentioned in the Intertek Report.

### 1.     Exclusion of Dr. Burke's Testimony

#### a.  Dr. Burke's Reports

KDI retained Dr. Burke, an economist, as an expert witness on damages. Dr. Burke issued a report dated October 16, 2023. (Doc. No. 45-9, PageID# 1783-93). Dr. Burke began his report by writing: "You've asked for my opinion concerning the economic loss to [KDI] resulting from lost opportunities to earn income due to their competitor, Metrasens, publishing a report falsely

28

comparing their products.  You have asked [me] to calculate damages based on the decrease in actual sales compared to KDI's forecasts."  (*Id*. at PageID# 1783.)   Dr. Burke testified at his deposition that he did not give an opinion on causation.  (Deposition of John F. Burke, Jr., Ph.D. ("Dr. Burke Depo.," Doc. No. 42-1, Tr. at 17:25-18:10, 48:21-49:3.)  Rather, he "assum[ed] the existence of a problem, and that problem is the decline in revenue, which, in the legal arena, you call damages."  (*Id*. at Tr. at 18:24-19:2.)

Regarding KDI's decreased sales, Dr. Burke wrote:

KDI had pre-incident sales from 2015-2018 (in millions) of $3.2, $4.2, $3.1, and $4.5.  Afterwards, KDI sales from 2019-2022 were $3.2, $3.9, $4.3, and $4.5. For this same time period, KDI had forecasted sales of $3.7, $4.1, $4.5, and $4.9. Additionally, KDI expected sales to grow by 7% in 2023 ($5.3 million), 8.70% in 2024 ($5.7 million), and 8.00% in 2025 ($6.2 million).  When actual sales are grown at these same rates, the computed loss of sales from 2019-2025 is equal to $2,713,289.

(Doc. No. 45-9, PageID# 1783-84.)  Dr. Burke then calculated "the lost EBITDA on the lost sales mentioned above."  (*Id*. at PageID# 1784.)  He calculated that "the present value lost EBITDA[2] from lost sales from 2019-2025 is equal to $602,767."  (*Id*.)  Dr. Burke next determined KDI's "future lost EBITDA from lost sales by capitalizing the lost 2025 lost EBITDA ($120,891)."  (*Id*.) Thus, in his October 2023 report, Dr. Burke opined "with reasonable economic certainty that the total losses to KDI equal $1,610,195 in present value."  (*Id*.)

Dr. Burke wrote that he had "reviewed and or relied" on the following documents in preparing his October 2023 report: (1) "2015-2022 KDI's Profit and Loss Statements;" (2) "2015-2022 KDI's Balance Sheets;" (3) "KDI Financial Highlights (2019);" and (4) "KDI's financial projections for 2019-2022 within their Copy of Lost Profits 2018-2022."  (*Id*. at PageID# 1783.)

---

[2] EBITDA is short for earnings before interest, taxes, depreciation, and amortization.

Most relevant here is the third item, i.e., "KDI Financial Highlights (2019)," which is part of the record. (Doc. No. 42-1, PageID# 1437-38.) Dr. Burke's report indicates that he took KDI's "projected growth rates" for the years 2023, 2024, and 2025 from the "Financial Highlights" document. (Doc. No. 45-9, PageID# 1793.) Dr. Burke confirmed this during his deposition. (Dr. Burke Depo., Doc. No. 42-1, Tr. 29:22-30:6.) The "Financial Highlights" document originates from page 6 of KDI's 2016 "Confidential Information Memorandum." (Doc. No. 42-1, PageID# 1502.) As explained above, Mr. Kopp also used this document to calculate KDI's estimated damages from 2019 through 2022. (Doc. No. 45-3.)

Dr. Burke issued a "revised and updated opinion" dated February 12, 2024. (Doc. No. 45-7.) Dr. Burke indicated that he revised his report to reflect various changes. (*Id.* at PageID# 1768.) As one notable change, Dr. Burke "[c]orrected the forecasted 2019-2022 gross sales to include the total revenue from all products rather than only the Halo product." (*Id.*) Dr. Burke testified at his deposition that he had made a mistake in his first report by focusing only on the Halo product. (Dr. Burke Depo., Doc. No. 42-1, Tr. at 82:9.)[3] Regarding KDI's decreased sales, Dr. Burke concluded in his revised opinion, in relevant part, as follows:

> KDI had pre-incident sales from 2015-2018 (in millions) of $3.2, $4.2, $3.1, and $4.5. Afterwards, KDI sales from 2019-2022 were $3.2, $3.9, $4.3, and $4.5. For this same time period, KDI had forecasted sales of $5.2, $5.8, $6.4, and $7.0 million. Additionally, KDI expected sales to grow by 7% in 2023 ($7.5 million), 8.70% in 2024 ($8.2 million), and 8.00% in 2025 ($8.8 million). When actual sales are grown at these same rates, the computed loss of sales from 2019-2025 is equal to $17,182,770.

(Doc. No. 45-7, PageID# 1768.) Dr. Burke also determined that "the present value lost EBITDA from lost sales from 2019-2025 is equal to $3,884,347." (*Id.*) He next determined KDI's "future

---

[3] It is unclear from the record why Dr. Burke focused on KDI's "Halo product" at all. The Intertek Report did not involve the "Halo product." As discussed above, the Intertek Report involved KDI's "Ferralert Solo" product.

lost EBITDA from lost sales by capitalizing the lost 2025 present value lost EBITDA ($643,898)."
(*Id*. at PageID# 1769.)  In sum, in his February 2024 revised report, Dr. Burke opined "with
reasonable economic certainty that the revised total losses to KDI equal $8,584,332 in present
value."  (*Id*.)

### b.  Fed. R. Evid. 702

Rule 702 of the Federal Rules of Evidence entrusts district courts with a "gatekeeping role"
to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant."
*Daubert*, 509 U.S. at 597.  *See also In re Onglyza (Saxagliptin) & Kombiglyze (Saxagliptin &
Metformin) Prods. Liab. Litig*., 93 F.4th 339, 345 (6th Cir. 2024).  As recently amended, Rule 702
provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training,
> or education may testify in the form of an opinion or otherwise if the proponent
> demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the
> trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods
> to the facts of the case.

Fed. R. Evid. 702.  Thus, the opinion offered by the expert must satisfy three requirements to be
admissible: "First, the witness must be qualified by 'knowledge, skill, experience, training, or
education.' Second, the testimony must be relevant, meaning that it 'will assist the trier of fact to
understand the evidence or to determine a fact in issue.'  Third, the testimony must be reliable."

*In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528–29 (6th Cir. 2008) (quoting Fed. R. Evid. 702); *accord United States v. Rios*, 830 F.3d 403, 413 (6th Cir. 2016).

Notably, Rule 702 was amended in December 2023 to "clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule." Fed. R. Evid. 702, Advisory Committee's Notes to 2023 amendments.  As the Advisory Committee Notes explain: "[M]any courts have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility.  These rulings are an incorrect application of Rules 702 and 104(a)."  *Id.  See also In re Onglyza (Saxagliptin) & Kombiglyze (Saxagliptin & Metformin) Prods. Liab. Litig.*, 93 F.4th at 348, n.7.  Additionally, "Rule 702(d) was rephrased to emphasize that an expert opinion must 'reflect[ ] a reliable application' of the expert's methodology."  *Id.* at 345, fn 4 (quoting Rule 702(d)).

Federal district courts have broad discretion to exclude proposed expert testimony.  *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 139 (1997).  *See also In re Scrap Metal*, 527 F.3d at 528 ("[W]e will not substitute our own judgment for that of the district court and will reverse an evidentiary decision 'only where we are left with a definite and firm conviction that [the district court] committed a clear error of judgment.'") (citation omitted).  Indeed, both the Supreme Court and the Sixth Circuit have emphasized that Rule 702 affords district courts "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).  *See also United States v. Simpson*, 845 F. App'x 403, 409 (6th Cir. 2021).

32

### i. Reliability

Metrasens contends that Dr. Burke's testimony is not reliable under Rule 702 and *Daubert*. (Doc. No. 42, PageID# 1309.) The requirement that an expert's testimony be reliable means that it must be "supported by appropriate validation—i.e., 'good grounds,' based on what is known." *Daubert,* 509 U.S. at 590. *See also In re Scrap Metal,* 527 F.3d at 529. "The task for the district court in deciding whether an expert opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *In re Scrap Metal*, 528 F.3d at 529-530. *See also Huffman v. Electrolux Home Products, Inc.,* 129 F.Supp.3d at 529, 537 N.D. Ohio 2015). In assessing reliability under Rule 702, district courts should consider such factors as "whether the testimony is based upon 'sufficient facts or data,' whether the testimony is the 'product of reliable principles and methods,' and whether the expert 'has applied the principles and methods reliably to the facts of the case.'" *In re Scrap Metal,* 527 F.3d at 528-529 (quoting Rule 702).

The Sixth Circuit has held that "[a] district court is not required to admit expert testimony 'that is connected to existing data only by the *ipse dixit* ['he himself said it'] of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.'" *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 254 (6th Cir. 2001) (quoting *GE v. Joiner*, 522 U.S. 136, 146 (1977)). For example, in *Ask Chems.*, plaintiff sued defendant for breach of contract following defendant's alleged failure to maintain plaintiff's Japanese patent. *Ask Chems,* 593 F. App'x at 507. Plaintiff's expert calculated the amount of plaintiff's alleged lost profits. *Id*. at 510. Defendant filed a motion to exclude plaintiff's expert witness. *Id*. at 508. The district court granted defendant's motion to exclude, finding that plaintiff's expert based his

calculations on fundamentally flawed data and impermissible methods. *Id*. at 508, 510. In particular, the expert determined the amount of lost profits, in part, from a marketing plan that plaintiff had produced a decade-and-a-half prior, which only covered the years 1998 to 2003, and from which he extrapolated future lost profits during the years 2013 to 2022—all without explaining his method or assumptions. *Id*. at 510. The expert also relied on plaintiff's 2011 global-market analysis, which estimated markets of various regions of the world, including Asia, but that did not provide data about Japan specifically. *Id*. Thus, according to the district court, it could not serve as a reasonable basis to estimate profits in Japan. *Id*.

On appeal, the Sixth Circuit affirmed the district's court's judgment, explaining in relevant part:

> Of course, "an expert may rely on otherwise inadmissible hearsay evidence in forming his opinion if the facts and data upon which he relies are of a type reasonably relied upon by experts in his field." *Arkwright Mut. Ins. Co. v. Gwinner Oil, Inc.*, 125 F.3d 1176, 1182 (8th Cir.1997). But [the expert's] wholesale adoption of Plaintiff's estimates, without revealing or apparently even evaluating the bases for those estimates, goes beyond relying on facts or data and instead cloaks unexamined assumptions in the authority of expert analysis. "As 'gatekeeper,' the trial judge is imbued with discretion in determining whether or not a proposed expert's testimony is admissible, based on whether it is both relevant and reliable." *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 429 (6th Cir.2007) (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)).

*Id*. at 510. The Sixth Court continued:

> On the facts of this case, and particularly in light of the unreliability of the evidence underlying Plaintiff's estimates, the district court was within its discretion to determine that the lack of independent verification or analysis of the revenue projections rendered [the expert's] opinion unreliable. Where an expert merely offers his client's opinion as his own, that opinion may be excluded. *See, e.g., CIT Grp./Bus. Credit, Inc. v. Graco Fishing & Rental Tools, Inc.*, 815 F. Supp. 2d 673, 677 (S.D.N.Y. 2011) (rejecting expert testimony based on "the conclusory statements of [the party's management] and not on his independent evaluation of the facts"); *King-Indiana Forge, Inc. v. Millennium*

34

*Forge, Inc.*, No. 1:07-cv-00341-SEBSML, 2009 U.S. Dist. LEXIS 96131, 2009 WL 3187685, at *2 (S.D. Ind. Sept. 29, 2009) ("When an expert's proffered opinion merely parrots information provided to him by a party, that opinion is generally excluded.").  Given the unreasonableness of [the expert's] methods, the faulty and incomplete data upon which they were based, and the general unreliability of the evidence, the district court did not abuse its discretion in excluding [expert's] testimony.

*Id*. at 510-11.

Metrasens argues that the "fundamental problem" with Dr. Burke's use of KDI's projections is that he did not prepare them and "did nothing to validate them."  (Doc. No. 42, PageID# 1317.)  According to Metrasens, Dr. Burke was aware that KDI's projections were not prepared in the ordinary course of business but as part of an effort to sell KDI.  (*Id*.)  He also knew that businesses prepare such sales or offering documents with the intention of making themselves look good.  (*Id*.)  In addition, Dr. Burke testified that he "accepted" KDI's sales projections because he is "one of those guys who trusts attorneys.  They give me the numbers, I believe them."  (Dr. Burke Depo., Doc. No. 42-1, Tr. at 92:25-93:13.)  Relying on *Ask Chems.* and the cases cited therein, Metrasens contends that Dr. Burke's report and testimony constitute "wholesale acceptance" of KDI's projections without any evaluation of their basis.  (Doc. No. 42, PageID# 1318.)  Therefore, Metrasens argues, Dr. Burke simply "cloak[s]" KDI's projections in an "unwarranted appearance of expertise."  (*Id*.)

In its Opposition, KDI agrees that *Ask Chems* is controlling.  (Doc. No. 45, PageID# 1655.)  However, KDI focuses mainly on other aspects of the *Ask Chems*. decision, such as the required data to demonstrate lost profits, which is not relevant in this case.  (*Id*. at PageID# 1655-56.)  KDI only briefly addresses Dr. Burke's reliance on its projections in the CIM.  (*Id.* at PageID# 1656.)  Specifically, KDI concedes that *Ask. Chems*. "require[s] that an expert evaluate the bases for the

35

lost revenue estimate by independently analyzing or verifying the revenue projections," but disputes Metrasens' assertion that Dr. Burke accepted its projections "wholesale."  (*Id.*)  Quoting from Dr. Burke's deposition testimony, KDI contends that Dr. Burke "accepted" KDI's projections after "finding them to be reasonable."  (*Id.*)

For the following reasons, the Court finds that Dr. Burke's opinion regarding KDI's economic loss is unreliable under Rule 702 and *Daubert*.  The Court recognizes that the law governing expert testimony distinguishes between permissible reliance and impermissible "parroting."  *Saginaw Chippewa Indian Tribe of Michigan v. Blue Cross Blue Shield of Michigan*, 2024 WL 3813734 at *7 (E.D. Mich. Aug. 14, 2024).  As stated, the Sixth Circuit has held that an expert's "wholesale adoption of [a plaintiff's] estimates, without . . . evaluating the bases for those estimates, goes beyond relying on facts or data and instead cloaks unexamined assumptions in the authority of expert analysis."  *Ask Chems.*, 593 F. App'x at 510.  Other district courts have excluded expert opinions for that reason.  *See, e.g., Auto Indus. Supplier Emp. Stock Ownership Plan (ESOP) v. Snapp Sys., Inc.*, 2008 WL 5383372 at *3 (E.D. Mich. Dec. 23, 2008) ("[Expert's] acceptance of [an]other's work and incorporating it into a report simply does not meet the reliability component necessary for expert testimony"), *aff'd* 435 F. App'x 430 (6th Cir. 2011); *Universal Coin & Bullion, Ltd v. Fed. Express Corp.*, 2015 WL 12001264 at *1 (W.D. Tenn. June 30, 2015) (excluding expert damages testimony based on the gross profit margin provided by counsel).

Here, the record demonstrates that Dr. Burke used KDI's projected growth rates as a key component to calculate decreased sales.  However, Dr. Burke acknowledged that he did not

36

evaluate the bases for KDI's projections.  Dr. Burke's deposition transcript contains the following exchanges:

Q. Did you consider the reasonableness of their future projections?

A. In general, not with any specificity.

Q. What does that mean? I don't understand that answer.

A. Oh, I looked at gross domestic product. I looked at some other areas in the bottom of this page and on the next page.  I looked at a couple of other things.  I looked at AlphaSense.  I just -- you know, you can see what -- some of the things I looked at.  But they're just in general.  They are not specific to this company.

Q. So my question is, did you evaluate the reasonableness of Kopp's future sales projections?

A. I thought they were reasonable.  I wouldn't say I evaluated them.  I thought they were reasonable.
. . .

Q. And I know I've asked this, but I just want to confirm.  And you didn't do any specific testing or validation of the numbers, correct?

A. I think these numbers would be validated by somebody with a different set of skills than me.  I think you're asking for these numbers to be audited, and that should be done by a CPA.

Q. Well, I'm not asking for them to be audited.  I'm asking whether you undertook any efforts to validate or confirm the reliability of these numbers?

A. Oh, I accepted them. I said that several times. I accepted these numbers as a given.

**Q. So the answer would be, no, you didn't do anything to validate –**

**A. Correct. I did not do anything.  As I said, maybe I'm naive, but I'm one of those guys who trust attorneys. They give me the numbers, I believe them. I'm married to an attorney.  I have to believe them.**

(Dr. Burke Depo., Doc. No. 42-1, Tr. at 56:10-57:1; 92:17-43:13) (emphasis added).  Despite Dr. Burke's stated belief that KDI's projections were "reasonable," his vague statements about the

"general" information he consulted only further demonstrate that he did not evaluate the bases for KDI's projected growth rates. Given how crucial KDI's projected growth rates are to Dr. Burke's damages calculation, the Court finds it was inappropriate for him to simply accept the rates KDI supplied to him. *See Universal Coin*, 2015 WL 12001264 at *12. Consequently, there is too great an analytical gap between the data and Dr. Burke's proffered opinion on the amount of KDI's economic loss. *See Nelson*, 243 F.3d at 254. In effect, Dr. Burke's opinion "cloaks" KDI's "unexamined" projected growth rates in "the authority of expert analysis." *Ask Chems.*, 593 F. App'x at 510. Accordingly, the Court concludes that Dr. Burke's opinion regarding the amount of KDI's damages based on KDI's projected sales figures, is not reliable under Rule 702 and *Daubert* and therefore must be excluded.[4]

### ii. Capitalization

KDI next argues that, even if this Court precludes Dr. Burke from opining on "causation" or "the calculation of KDI's initial losses," his testimony is still relevant to explain the "capitalization" of KDI's losses. (Doc. No. 45, PageID# 1657.) Specifically, KDI argues that Dr. Burke should "be permitted to testify as to KDI's damages and how capitalization plays a role in determining the true value of KDI's losses, as opposed to a simple calculation of the value of difference of revenues from actual to forecasted years." (*Id.*) Acknowledging that "the ultimate calculation of damages is difficult to ascertain," KDI asserts that "[t]he method of comparing forecasted revenue against realized revenue and then capitalizing the total is the closest KDI believes it can get to ascertaining the exact damage caused by Metrasens." (*Id.* at PageID#s 1657-

---

[4] Since the Court has excluded Dr. Burke's opinion based on lack of reliability, the Court need not, and will not, address Metrasens' alternative argument that Dr. Burke's testimony should be excluded because he calculated damages based on sales of KDI products other than the Solo screener, including KDI's Halo screener. *See* Doc. No. 42, PageID#s 1320-1324.

1658.)  Thus, KDI maintains, "regardless of whether Dr. Burke is permitted to opine on the starting point for KDI's damage, he should at the very least be permitted to testify as to how to extrapolate damages from forecasted numbers into future years," especially given the fact that Metrasens refused to remove its advertisement from its website until September 2023.  (*Id*. at PageID# 1659.)

In response, Metrasens reiterates that Dr. Burke failed to validate any of Mr. Kopp's sales forecasts/projections and, therefore, any testimony premised on such projections is unreliable and should be excluded under Rule 702.  (Doc. No. 47, PageID#s 2591-2595.)  Metrasens further asserts, summarily, that "[n]or is there any way Dr. Burke could advise the jury on how to do 'capitalization' (presumably, reduction to present value) of losses without knowing what the jury concluded the losses were for any given year."  (*Id*. at PageID# 2594.)  Metranses argues that "KDI cites no precedent for its extraordinary proposal and does not explain how it could work."  (*Id*.)

At the outset, the Court finds that neither party sufficiently explains the concepts underlying Dr. Burke's opinion and testimony regarding the "capitalization of KDI's losses." While not cited by either party, the Court notes that the record reflects the following.  In his October 16, 2023 Expert Report and February 12, 2024 Revised Expert Report, Dr. Burke (among other things) calculated the lost EDITBA on KDI's lost sales for 2019 through 2025, and then "capitalized the lost 2025 present value lost EDITBA."[5]  (Doc. No. 45-9 at PageID# 1784; Doc. No. 45-7 at PageID# 1769.)  In his deposition (which was taken on May 8, 2024), Dr. Burke explained the process of "capitalizing the 2025 lost EBITDA," in relevant part, as follows:

---

[5] Specifically, in his February 12, 2024 Revised Report, Dr. Burke opines (in relevant part) that: "The second step in the valuation of damages determined the Company's future lost EBITDA from lost sales by capitalizing the lost 2025 present value lost EBITDA ($643,898). EBITDA was capitalized by the median WACC reported for this industry by a 13.7 percent capitalization rate and the present value of future losses is equal to an additional $4,699,984. Accordingly, it is with reasonable economic certainty that the revised total losses to KDI equal $8,584,332 in present value."  (Doc. No. 45-7, PageID# 1768-1769.)

A:      *** It's a simple process of saying to yourself, for example, if the five -- if the interest rate is 5 percent and I want a thousand dollars a year, how much money do I have to put in the bank today, at 5 percent, to get a thousand dollars a year? And the answer is 20,000. So, you put $20,000 in the bank at 5 percent, you're going to get a thousand dollars this year, next year, year after, that year after that, year after that, year after that, year after that. So that's the idea. That's the concept of capitalized value.

Q:      And in calculation of future lost EBITDA, does that continue -- how long does that continue on?

A:      Infinity. It's an asymptote. Goes on forever. Goes on forever. It gets a quote, there's a limit, 20,000. The line goes up and up and up and approaches, approaches, approaches, approaches, approaches, approaches, but never gets there. It's an asymptote, So it goes on forever.

***

Q:      So, what is the justification for applying that principle in this case?

A:      The justification is, if there is a problem, and if the problem is not cured, then the problem's going to go on forever. And, therefore, if it goes on forever, you used a capitalized value. However, with a capitalized value, depending upon what rate of interest you use, capitalized value is the same thing as discounting at that same rate forever. So if you capitalize something at, say, 15 percent, by about the fifth year, you've cut it in half. So it diminishes rapidly.

Q:      So back to my question about assumptions, then. So in capitalizing the valuation of the damages in perpetuity, you're assuming that the harm is continuing; is that correct?

A:      Yes, sir. And if some smart person can figure out when the harm ends, then we should end it at that point.

Q:      That was my next question. So if the harm is mitigated, then the projection ends, which I think is what you just said, correct?

A:      Exactly. You're exactly right, Counsel. And if it ended in the past, then there is no future. But if it doesn't end until sometime in the future, one year, three years, ten years, whatever, if some smart person can figure out what point in time that is, then we would end it at that point in time. We would discount all the years between then and now by that capitalization rate and then cut it off.

Q:      Do you know whether the event, that is alleged to have caused the harm in this case, has continued?

A:      I believe it has, but I don't know that. I believe it has. I'm not sure it has been rectified, but I believe it has -- but I believe it continues.

(Dr. Burke Depo., Doc. No. 42-1, Tr. 36:1-22, 37:18 - 39:9.)

KDI's argument that Dr. Burke should be permitted to testify regarding capitalization of KDI's losses is confusing, at best.  At one point, KDI appears to argue that Dr. Burke should be permitted to opine regarding KDI's "revenue forecasts" and to "compare [KDI's] forecasted revenue against realized revenue." (Doc. No. 45, PageID# 1658.)  At another point, however, KDI appears to suggest a more limited role for Dr. Burke, in which he would be provided an amount of KDI's damages (or "initial losses") and then "capitalize" the value of that amount "over time." (*Id*. at PageID# 1657.)  Metrasens' response to KDI's argument is perfunctory, and not particularly helpful.  (Doc. No. 47, PageID# 2594.)

In the absence of clear briefing on this issue from either party, the Court finds as follows. To the extent KDI is arguing that Dr. Burke should be permitted to calculate the capitalization of damages based on his opinion of KDI's projected sales figures/growth, the Court finds that any such testimony is not admissible.  As discussed at length above, Dr. Burke may not opine regarding KDI's projected sales figures/growth because he failed to evaluate the bases for those projections or otherwise undertake any meaningful effort to validate them himself.  It therefore follows that Dr. Burke cannot reliably testify "as to how to extrapolate damages from forecasted numbers into future years," where the basis of the "forecasted numbers" is Dr. Burke's proffered opinion regarding KDI's projected sales figures/growth. (Doc. No. 45, PageID# 1659.)  This is particularly the case in light of Dr. Burke's acknowledgment in deposition that he does not know whether, or

41

for how long, the alleged harm resulting from Metrasens' advertisement continued.  (Dr. Burke Depo., Doc. No. 42-1, Tr. 38:7 -39:9.)

However, in the event that KDI introduces admissible evidence at trial that it suffered a projected loss of revenue in a reasonably certain amount as a result of Metrasens' advertisements, the Court will consider allowing Dr. Burke to testify regarding the capitalization of that amount of damages.  Any testimony by Dr. Burke on this issue would be contingent, however, on KDI's presentation of admissible evidence establishing both a reasonably certain amount of projected damages, as well as a reasonable period of time over which to capitalize any such projected damages.  The Court concludes that it is premature to resolve this issue at this time and will address the permissible scope and nature of any such testimony, if and as necessary, at a later stage of the proceedings.

### 2.    Other Evidence Regarding the Amount of KDI's Damages

KDI next argues that "even if Dr. Burke is in some fashion excluded, KDI may still prove its damages through the evidence presented above," i.e., Mr. Kopp's testimony and associated documentary evidence regarding KDI's lost UPMC sales and reduced revenue.  (Doc. No. 45, PageID# 1659.)  Specifically, KDI asserts that the Lanham Act does not require expert testimony to support a monetary award of actual damages and that "many sources can provide the requisite information upon which a reasonable jury may calculate damages." (*Id.*) (citing cases).

Metrasens does not directly address this argument in its Reply Brief.  (Doc. No. 47.) Rather, Metrasens argues generally that Mr. Kopp's testimony regarding KDI's "actual damages" is inadmissible as conclusory, speculative, hearsay, and/or improper expert opinion testimony.  (*Id.* at PageID#s 2575, 2582- 2590.)  As discussed above, the Court has rejected this argument in part,

42

and found that Mr. Kopp may testify with respect to KDI's lost sales to UPMC and reduced revenues. Nonetheless, Metrasens goes on to assert that, even assuming there is admissible evidence that KDI was damaged by the Intertek Report and/or Summary, "a jury cannot simply pick a number out of the air or accept whatever is proposed by a plaintiff, without regard to whether there is reasonable support." (*Id.* at PageID# 2590.) Metrasens argues that "KDI has offered only the testimony of Dr. Burke" as evidence of the amount of its damages and, therefore, without his testimony, "summary judgment is proper on all of KDI's damages claims." (*Id.* at PageID# 2591.)

The Court disagrees with Metrasens that KDI's only evidence regarding the amount of its damages is the testimony of Dr. Burke. As discussed *supra*, the Court has found that there are genuine issues of material fact regarding KDI's claims that, as a result of Metrases' allegedly false advertisements, it suffered damages in the form of loss of business from UPMC and reduced revenue. At trial, KDI will have the opportunity to introduce evidence to demonstrate, with reasonable certainty, the amount of its actual damages associated with its alleged reduced revenue and/or loss of the UPMC business. For example, KDI may seek to introduce testimony from Mr. Kopp and/or other KDI employees (such as Anna Srb) regarding the dollar value of the specific lost sales to UPMC that are referenced in the February 2021 emails between Ms. Srb and UPMC Project Manager Heather Yahn. (Doc. No. 45-5, PageID#s 1759-1763.) KDI may also seek to introduce documentary evidence (in the form of contracts, sales invoices, etc.) to support the amount of actual damages that it allegedly suffered as a result of this loss of UPMC business. Regarding its alleged lost revenues, KDI may seek to introduce testimony from Mr. Kopp and/or other KDI employees regarding KDI's sales figures/revenue before and after Metrasens began

using its allegedly false advertisements. KDI may also seek to introduce documentary evidence (such as Mr. Kopp's damages summary (Doc. No. 45-3) and KDI's Profits and Loss Statements, for example) to further attempt to prove a reduction in revenue as a result of Metrasens' use of the Intertek Report and Summary. [6]

Moreover, Metrasens does not direct this Court's attention to any authority that KDI may not use such evidence to prove the amount of its actual damages. To the contrary, several Circuit Courts of Appeals have found that non-experts may testify as to damages stemming from a Lanham Act violation. For example, in *Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105, 1112-1113 (9th Cir. 2012), the Ninth Circuit explained:

> We emphasize that [Lanham Act] section 1117 "confers a wide scope of discretion upon the district judge in fashioning a remedy." *See Maier Brewing Co. v. Fleischmann Distilling Corp.*, 390 F.2d 117, 121 (9th Cir.1968). **Section 1117 demands neither empirical quantification nor expert testimony to support a monetary award of actual damages; many sources can provide the requisite information upon which a reasonable jury may calculate damages**. *Cf. Louis Vuitton S.A. v. Spencer Handbags Corp.*, 765 F.2d 966, 973 (2d Cir.1985) (upholding calculation of damages based on statements made on a videotape and noting that "[r]ecovery under section 1117 is not limited to cases in which the quantum of actual damages is demonstrated").

*Id.* at 1112-1113 (emphasis added). *See also Grasshopper House LLC v. Clean and Sober Media LLC,* 2021 WL 3702243 at fn 2 (9th Cir. Aug. 20, 2021) ("To be sure, a non-expert is allowed to testify as to damages stemming from a Lanham Act violation.") (citing *Skydive Ariz., Inc.*, 673 F.3d at 1112-13)). Likewise, the Second Circuit has upheld damages awards in Lanham Act cases

---

[6] As noted *supra*, Metrasens complains that Mr. Kopp's revenue projections are both unreliable and unsubstantiated because (1) they come from KDI's 2016 CIM, which was prepared in connection with the potential sale of the business and are, thus, overstated; and (2) Mr. Kopp failed to sufficiently explain the bases of his projections during his deposition. (Doc. No. 47, PageID#s 2583-2584.) For all the reasons discussed above, however, the Court has found that Mr. Kopp's testimony regarding KDI's reduced revenues is admissible lay opinion testimony. Of course, Metrasens may cross-examine Mr. Kopp at trial regarding the alleged deficiencies in his reduced revenue estimates.

where the amount of damages was based on the testimony of a non-expert witness. *See, e.g., General Security Inc. v. Commercial Fire & Security, Inc.*, 2024 WL 1756111 (2nd Cir. April 24, 2024) (affirming district court's award of damages where dollar amount was based on testimony of the plaintiff's General Manager regarding the average estimated duration of plaintiff's customer accounts). District courts have reached similar conclusions. *See, e.g., Yeti Enterprises Inc. v. Tang*, 2017 WL 3478484 at * 14 - 15 (D. Or. Aug. 14, 2017); *North Atlantic Operating Company, Inc v. Hammad Enterprises, Inc.*, 2020 WL 1286180 at * 3 (S.D. Fla. Jan. 15, 2020).

Accordingly, the Court finds that, even though it has excluded Dr. Burke's testimony as set forth above, KDI may nonetheless attempt to prove the amount of its alleged damages at trial through the introduction of non-expert evidence.

### C.    Injunctive Relief

In the Complaint, KDI seeks "an order enjoining Defendant from publishing, advertising, marketing, and/or promoting any false or misleading information regarding Kopp Development products." (Doc. No. 1 at p. 11.) Metrasens argues that KDI's request for injunctive relief is moot because Metrasens "previously removed the Intertek Report and all references to the report from its website" and "agreed not to make use of the report or its information in the future." (Doc. No. 42, PageID# 1310.) Specifically, Metrasens cites the Declaration of its CEO Simon Goodyear, which is attached to the Confirmation that was filed in this Court on June 26, 2024. (Doc. No. 40-1.) Therein, Mr. Goodyear avers, under penalty of perjury, as follows:

> 4.    Although neither I nor Metrasens believe that the Intertek Report is misleading or incorrect, because of the litigation Metrasens decided to remove all references to the Intertek Report, as well as the means for requesting a copy, from its website. The summary and all references to the Intertek were removed from Metrasens' website at least as early as September 1, 2023.

5.     In order to avoid the expense of litigation, Metrasens confirms it will not hereafter place the Intertek Report or any reference to the Intertek Report on its website. Metrasens further confirms it will not hereafter distribute the Intertek Report, or any materials mentioning or referring to the Intertek Report, to the public, to prospective customers, or to actual customers.

6.     Metrasens also will not hereafter discuss with third parties or distribute to third parties the information in the report that compares the performance of the Metrasens product to the product of Kopp Development, Inc.

7.     Metrasens will continue with its policy, not to disclose or use the report or the comparative information in it, even after the resolution of this litigation by Kopp, and even if the Kopp claims are dismissed.

(Decl. of Simon Goodyear (Doc. No. 40-1) at ¶¶ 4-7.)  Citing cases, Metrasens maintains that "courts have repeatedly denied permanent injunctions where the challenged conduct has halted and there is no basis on which to expect repetition."  (Doc. No. 42, PageID#s 1311-1312.)

In response, KDI argues that Metransens' decision "to remove the false ad in 2024 after being asked to do so in 2021 amounts to too little, too late."  (Doc. No. 45, PageID# 1661.)  KDI asserts that it is "most assuredly unassured that Metransens will refrain from promulgating the false information in one way or another in perpetuity."  (*Id*. at PageID# 1662.)  Specifically, KDI maintains that "there is no guarantee that any individual salesperson from Metrasens will not use the advertisement in calling on would-be KDI customers."  (*Id*.)  KDI, therefore, argues that its request for injunctive relief is not moot and, further, that it will seek all available injunctive remedies, "including possibly a request that Metrasens issue an apology and retraction to the MRI screener marketplace."  (*Id*.)

In its Reply Brief, Metrasens reiterates that it "will not resume dissemination of the report or its data."  (Doc. No. 47, PageID# 2598.)  Metrasens argues that KDI asserts "only the existence of a possibility" Metrasens will use the Intertek Report in the future, which it suggests is

46

insufficient to warrant a permanent injunction. (*Id.*) Metrasens further maintains that "[i]n asserting that it still wants a trial on is injunction claim—presumably even if all other claims are dismissed— KDI seeks to force this Court and the parties through a trial on all issues in dispute, other than damages." (*Id.*) Metrasens complains that "[t]he parties will have to litigate the scope of changes made by KDI, the effect on the product, accuracy of the Intertek Report, and the likely effect on customers in the hypothetical event of future dissemination." (*Id.*) Metrasens argues that "it is hard to see how the 'balance of hardships' tips in favor of an injunction-only trial and issuance of a permanent injunction." (*Id.*)

The Lanham Act authorizes a court to grant injunctive relief "according to the principles of equity and upon such terms as the court may deem reasonable" to prevent a violation under 15 U.S.C. § 1125(a). *See* 15 U.S.C. § 1116(a). District courts apply a four factor test to requests for permanent injunctive relief. Specifically, the Supreme Court and Sixth Circuit have held that "[a] court may issue a permanent injunction when the party requesting the injunction demonstrates that: (1) it will suffer an irreparable injury absent an injunction; (2) legal remedies, such as money damages, provide inadequate compensation; (3) the balance of hardships warrants an injunction; and (4) the public interest would not be disserved by an injunction." *Lucky's Detroit LLC v. Double L, Inc.,* 533 F. App'x 553, 555 (6th Cir. 2013) (citing *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)). *See also Weinberger v. Romero—Barcelo*, 456 U.S. 305, 311–313 (1982).

Here, neither party acknowledges, addresses, or applies the four permanent injunction factors set forth above. It appears, however, that Metrasens' primary argument is that it is entitled to judgment in its favor on KDI's request for permanent injunctive relief because KDI cannot show

47

that it will suffer ongoing irreparable injury given Mr. Goodyear's Declaration that Metrasens has removed the Intertek Report from its website and will no longer distribute, discuss, or disclose it to third parties.

The Court find Metrasens' argument to be without merit.  Although Metrasens has removed the Intertek Report from its website and states that it will no longer disseminate the information contained therein, the fact remains that, without the issuance of a Court-ordered injunction, KDI would have no assurance other than Metrasens' word that the Intertek Report and/or Summary would not be reposted on Metrasens' website or otherwise used by Metrasens' sales force.  And given the contentious history between KDI and Metrasens, and Metrasens' refusal to remove the Intertek Report from its website for over two years after the instant action was filed, the Court agrees that there remains a potential for irreparable injury to KDI absent an injunction, despite the assurances set forth in Mr. Goodyear's Declaration. *See, e.g., Terves LLC v. Yueyang Aerospace New Materials Co., Ltd.*, 2022 WL 2834743 at * 2 (N.D. Ohio July 20, 2022) (in granting permanent injunction, finding that "neither Terves nor the Court should be expected to rely solely on the Defendants' unilateral promise that infringement will cease."); *Innovation Ventures LLC v. Body Dynames, Inc.*, 2009 WL 877640 at * 8 (E.D. Mich. March 30, 2009) (in granting preliminary injunction, finding that "[v]oluntary cessation of complained of conduct does not render a claim for injunctive relief moot").  The Court further finds that, if successful at trial, KDI may be entitled to other forms of injunctive relief, such as an apology and/or retraction.  Metrasens' argument that KDI's request for injunctive relief is "moot" is, therefore, without merit.

Metrasens' reliance on *Taubman Co. v. Webfeats*, 319 F.3d 770 (6th Cir. 2003) is misplaced.  (Doc. No. 42, PageID# 1311.)  In that case, defendant Henry Mishkoff d/b/a Webfeats

("Mishkoff") learned that plaintiff was building a shopping mall called "The Shops at Willow Bend." *Id*. at 772. Mishkoff registered the domain name, "shoptsatwillowbend.com" and created an internet website with that address. *Id*. Mishkoff described the site as a "fan site" with no commercial purpose. *Id*. Mishkoff was not a competitor of plaintiff's and, in fact, his website contained a prominent disclaimer indicating it was unofficial, as well as a link to plaintiff's official site for the mall. *Id*. Mishkoff's website also contained links to the website of a company owned by his girlfriend that sold custom made shirts, and to Mishkoff's own site for his web design business. *Id*. Plaintiff demanded that Mishkoff remove the "fan site." When Mishkoff refused, plaintiff filed suit for trademark infringement under the Lanham Act and moved for a preliminary injunction. *Id*. Mishkoff responded by registering five additional domain names (including "taubmansucks.com" and "shopsatwillowbendsucks.com"), which are known in internet parlance as "complaint names." *Id*. The district court granted plaintiff's request for a preliminary injunction with respect to both the original website name, and the "complaint names." *Id.* at 773.

The Sixth Circuit reversed, finding that plaintiff had not demonstrated a likelihood of success on the merits and that the district court's orders represented a prior restraint on Mishkoff's First Amendment rights. The Sixth Circuit reasoned that, by including links to his girlfriend's business and his own web design company, Mishkoff's "fan site" constituted use of plaintiff's mark in connection with the advertising of goods and, thus, fell within the scope of the Lanham Act. *Id*. at 775. However, the Sixth Circuit noted that Mishkoff had removed the link to his girlfriend's business prior to the injunction. *Id.* The Court found that "[a] preliminary injunction is proper only to prevent an on-going violation" and "[a]s long as Mishkoff has no commercial

49

links on either of his websites … we find no use 'in connection with the advertising' of goods and services to enjoin, and the Lanham Act cannot be properly invoked." *Id.* at 776.

The Court went on to find that, even if Mishkoff's use was commercial speech and within the jurisdiction of the Lanham Act, there was no likelihood of confusion in light of Mishkoff's website's disclaimer. *Id.* Regarding the "complaint names," the Sixth Circuit found that Mishkoff's use of these names was "purely an exhibition of Free Speech" and, therefore, not subject to scrutiny under the Lanham Act. *Id*. at 777-778. The Court further found that "[b]ecause Mishkoff is not using Taubman's mark to peddle competing goods, and because any damages would be economic in nature and fully compensable monetarily, we find no potential for irreparable harm to Taubman that should lead us to uphold the injunctions." *Id.* at 778.

The instant action is distinguishable from *Taubman*. As set forth above, in *Taubman*, the Sixth Circuit determined that a preliminary injunction was not appropriate because (1) Mishkoff's "fan site" did not fall within the scope of the Lanham Act once Mishkoff removed the links to his girlfriend's business, and (2) there was no potential for irreparable harm because Mishkoff was not using plaintiff's mark "to peddle competing goods." *Taubman*, 319 F.3d at 775, 778. Here, however, it is undisputed that the Intertek Report and Summary both fall within the scope of the Lanham Act and that KDI and Metrasens are fierce competitors. If the jury were to find in favor of KDI on its Lanham Act and/or Ohio tort claims, KDI should have the opportunity to cross examine Mr. Goodyear regarding his Declaration and to demonstrate that Metrasens' continued use of the Intertek Report and/or Summary was possible and could cause irreparable injury.

50

Thus, the Court finds that Metransens' reliance on *Taubman* is misplaced and that Metrasens has failed to demonstrate that it is entitled to judgment in its favor on KDI's request for permanent injunctive relief.[7]

## V.    Conclusion

For all the reasons set forth above, Defendant Metrasens, Inc.'s Motion to Exclude Testimony of Plaintiff's Damages Expert and for Summary Judgment as to All Claims (Doc. No. 42) is GRANTED IN PART and DENIED IN PART, as follows.  Metrasens' Motion for Summary Judgment as to Plaintiff KDI's Lanham Act and Ohio tort claims (Counts I through IV) is DENIED.  Metrasens' Motion to Exclude the testimony of Dr. Burke regarding KDI's actual damages is GRANTED IN PART and DENIED IN PART as set forth herein.  Specifically, Metrasens' Motion to Exclude is granted as to Dr. Burke's testimony regarding the amount of KDI's alleged damages based on KDI's projected sales figures.  However, Metrasens' Motion to Exclude is denied to the extent that, if KDI introduces admissible evidence at trial that it suffered a reasonably certain amount of projected damages as a result of Metrasens' advertisements, the Court will consider allowing Dr. Burke to testify regarding the capitalization of that amount of projected damages.

**IT IS SO ORDERED.**

Dated:  November 19, 2024          *s/Pamela A. Barker*
                                    PAMELA A. BARKER
                                    UNITED STATES DISTRICT JUDGE

---

[7] The Court also rejects Metrasens' argument that the third permanent injunction factor –the "balance of hardships" – weighs in its favor.  Metrasens' argument is premised on the assumption that any trial would be an "injunction-only trial." (Doc. No. 47, PageID# 2598.)  However, as set forth at length above, the Court has found that the record demonstrates a genuine issue of material fact regarding both the existence and amount of damages with respect to KDI's Lanham Act and Ohio tort claims.  Metrasens offers no other argument or explanation why the "balance of hardships" would weigh in its favor given the Court's finding that this matter will proceed to jury trial on KDI's Lanham and Ohio tort claims.